MILES HILL, plaintiff in error, *vs.* THE STATE OF GEORGIA defendant in error.

1. An indictment under section 4528 of the Code, prohibiting the carrying of pistols, etc., to any court of justice, etc., is sufficiently certain and full, which alleges that the carrying was "to and at a court of justice, then in session, in and for the four hundred and twenty-sixth district, Georgia Militia."

2. Article I., section 14, of the constitution of 1868, which is as follows: "A well regulated militia being necessary to the security of a free state, the right of the people to keep and bear arms shall not be infringed ; but the general assembly shall have power to prescribe the manner in which arms may be borne," does not prohibit the general assembly from making it penal to keep and bear arms in the presence of courts of justice.

Hill *vs.* The State of Georgia.

Criminal law. Constitutional law. Before Judge RICE. White Superior Court. May Term, 1874.

It is unnecessary to an understanding of this decision, to report any facts additional to those stated in the above head-notes.

C. H. SUTTON; UNDERWOOD & WILLIAMS, for plaintiff in error.

EMORY SPEER, solicitor general, by W. B. THOMAS, for the state.

McCAY, Judge.

1. We think the description sufficient. Under our Code, if the offense is set out in the language of the Code, that is sufficient. The indictment alleges that the pistol was carried at, and in the presence of, a court of justice, then in session in the four hundred and twenty-sixth district, Georgia militia. This is in the very words of the act. What was the name and nature of the court is matter of description. It would have been well to state it. Though, as the justice's court is the only civil court that can meet at such a place, the words used do, in effect, describe the court in question as the justice court for that district.

2. The other question made in this record is a far graver one. It is insisted that the act describing the offense charged and fixing the penalty, is an infringement of the right of the citizens of this state as guaranteed by the constitution of the United States and of this state. It is now well settled that the amendments to the constitution of the United States of March 4th, 1789, are all restrictions, not upon the states, but upon the United States. And this would seem to be the inevitable conclusion from the history of these amendments as well as from their nature and even their terms. I do not myself assent to that other limitation of the legislative powers of our general assembly insisted upon in the argument,

and sometimes announced by courts, to-wit: the "higher law," which is appealed to as above even the constitution. At last, therefore, if this act be unconstitutional it must be because it is in conflict with our state constitution. Article I., section 14, of the constitution of 1868 is as follows: "A well regulated militia being necessary to the security of a free state, the right of the people to keep and bear arms shall not be infringed ; but the general assembly shall have power to prescribe by law the manner in which arms may be borne." The act of October, 1870, upon which this indictment is based, is in these words: "No person in said state shall be permitted or allowed to carry about his or her person any dirk, Bowie-knife, pistol or revolver, or any kind of deadly weapon, to any court of justice or any election ground or precinct, or any place of public worship, or any other public gathering in this state, except militia muster grounds."

Were this question entirely a new one, I should not myself hesitate to hold that the language of the constitution of this state, as well as that of the United States, guarantees only the right to keep and bear the "arms" necessary for a militiaman. It is to secure the existence of a well regulated militia; that, by the express words of the clause, was the object of it, and I have always been at a loss to follow the line of thought that extends the guarantee to the right to carry pistols, dirks, Bowie-knives, and those other weapons of like character, which, as all admit, are the greatest nuisances of our day. It is in my judgment a perversion of the meaning of the word arms, as used in the phrase "the right to keep and bear arms," to treat it as including weapons of this character. The preamble to the clause is the key to the meaning of it. The word "arms," evidently means the arms of a militiaman, the weapons ordinarily used in battle, to-wit: guns of every kind, swords, bayonets, horseman's pistols, etc. The very words, "bear arms," had then and now have, a technical meaning. The "arms bearing" part of a people, were its men fit for service on the field of battle. That country was "armed" that had an army ready for fight.

Hill *vs*. The State of Georgia.

The call "to arms," was a call to put on the habiliments of *battle*, and I greatly doubt if in any good author of those days, a use of the word arms when applied to a people, can be found, which includes pocket-pistols, dirks, sword-canes, toothpicks, Bowie-knives, and a host of other relics of past barbarism, or inventions of modern savagery of like character. In what manner the right to keep and bear these pests of society, can encourage or secure the existence of a militia, and especially of a well regulated militia, I am not able to divine. But assuming that the guarantee of our state constitution was intended to include weapons of this character, (which, considering that it was made a part of the constitution after the decision of *Nunn vs. The State*, in 1 *Kelly*, is not improbable,) we still are of the opinion that the act of October, 1870, is not unconstitutional. The practice of carrying arms at courts, elections and places of worship, etc., is a thing so improper in itself, so shocking to all sense of propriety, so wholly useless and full of evil, that it would be strange if the framers of the constitution have used words broad enough to give it a constitutional guarantee. Take the clause in its largest sense; let the word "arms" include weapons of every kind; we think its guarantee would not cover so absurd, useless, defiant, and disorderly a practice as this act of 1870 forbids. Upon its very front, as we have said, the object of the clause is declared to be to secure to the state a well regulated militia. Has this declaration *no* significance? Is the clause to be interpreted without reference to it? On the contrary, by the well settled rules for the interpretation of laws, as well as by the dictates of common sense, the object and intent of the law is the prime key to its meaning. A well regulated militia may fairly mean—" the arms-bearing population of the state, organized under the law, in possession of weapons for defending the state, and accustomed to their use." The constitution declares that as such a militia is necessary to the existence of a free state, the right of the people to keep and bear arms shall not be infringed. To effect this end, the right to have arms would

seem to be absolute, since without this right, it would not be possible to attain the end contemplated, to-wit: an armed militia, organized and ready for the public exigencies. But it is obvious that the right to bear or carry arms about the persons at all times and places and under all circumstances, is not a necessity for the declared object of the guarantee; nay, that it does not even tend to secure the great purpose sought for, to-wit: that the people shall be familiar with the use of arms and capable from their habits of life, of becoming efficient militiamen. If the general right to carry and to use them exist; if they may at pleasure be borne and used in the fields, and in the woods, on the highways and bye-ways, at home and abroad, the whole declared purpose of the provision is fulfilled. The right to keep and to bear arms *so that* the state may be secured in the existence of a well regulated militia, is fully attained. The people have, or may have the arms the public exigencies require, and being unrestricted in the bearing and using of them, except under special and peculiar circumstances, there is no infringement of the constitutional guarantee. The right to bear arms in order that the state may, when its exigencies demand, have at call a body of men, having arms at their command, belonging to themselves and habituated to the use of them, is in no fair sense a guarantee that the owners of these arms may bear them at concerts, and prayer-meetings, and elections. At such places, the bearing of arms of any sort, is an eye-sore to good citizens, offensive to peaceable people, an indication of a want of a proper respect for the majesty of the laws, and a marked breach of good manners. If borne at all under the law, they must be borne openly and plainly exposed to view, and under the circumstances we allude to, the very act is not only a provocation to a breach of the peace, but dangerous to human life. The constitution is to be construed as a whole. One part of it is not to be understood in such a sense as will militate against another. It is as well the duty of the general assembly to pass laws for the protection of the person and property of the citizen as it is to abstain from any in-

fringement of the right to bear arms. The preservation of the public peace, and the protection of the people against violence, are constitutional duties of the legislature, and the guarantee of the right to keep and bear arms is to be understood and construed in connection and in harmony with these constitutional duties.

Section 5 of the bill of rights is in these words: "The right of the people to appeal to the courts, to petition government in all matters and peaceably to assemble for the consideration of any matter, shall not be *impaired.*" Is this section violated if the courts are not always in session? If the legislature restrict the appeal to certain times and places, and under certain reasonable conditions necessary for the public good; if it pass a statute of limitations, or regulate the rules of evidence or provide that one judgment of the court shall be conclusive, all these are limitations upon the right to appeal to the courts. But they are necessities of society, and are enacted because this guarantee of the right to appeal to the courts is not all of the constitution, and is to be construed in reference to the fact that there are other duties cast upon the legislature besides keeping this right of appeal to the courts unimpaired. So, too, of the right to petition government upon any matter. Has a witness upon the stand, or a juryman in the box, a right to quit his post of duty and obstruct the progress of business by devoting himself to the preparation of a petition to the government for a redress of grievances? So, too, there is a guarantee of the right of the people peaceably to assemble for the consideration of any matter. May they assemble *any* where, on *any* land, in *any* house, and that against the consent of the owner? Obviously, all these provisions and guarantees are to be construed in reference to their nature, and to other clauses and other duties of the constitution. One guarantee is not to swallow up all others, but each is to be construed reasonably in reference to its plain intent, and in reference to other duties cast upon the legislature, and other rights guaranteed to the people. The right to go into a court-house and peace-

fully and safely seek its privileges, is just as sacred as the right to carry arms, and if the temple of justice is turned into a barracks, and a visitor to it is compelled to mingle in a crowd of men loaded down with pistols and Bowie-knives, or bristling with guns and bayonets, his right of free access to the courts is just as much restricted as is the right to bear arms infringed by prohibiting the practice before courts of justice.

The right peaceably to meet and worship God, or to vote for public officers, or to do any other public duty, are rights just as sacred, just as solemnly guaranteed, and just as necessary for the existence of a free state as the right to bear arms, and either of them is seriously interfered with if it is the right and the custom of "people" to attend such meetings armed as though for battle. Under such circumstances those assembled are under the protection of the law. They are met at the command or under the permission of the law, and it is a high constitutional duty of the state to protect them, to see that good order is preserved, and that they may perform the purpose of their assembling unmolested by terror, or danger, or insult. To suppose that the framers of the constitution ever dreamed, that in their anxiety to secure to the state a well regulated militia, they were sacrificing the dignity of their courts of justice, the sanctity of their houses of worship, and the peacefulness and good order of their other necessary public assemblies, is absurd. To do so, is to assume that they took it for granted that their whole scheme of law and order, and government and protection, would be a failure, and that the people, instead of depending upon the laws and the public authorities for protection, were each man to take care of himself, and to be always ready to resist to the death, then and there, all opposers. We do not so believe, and we are not ready so to suppose. On the contrary, we take it for granted that they meant what they have said, and that in guaranteeing the right to keep and bear arms, they never dreamed they were authorizing practices, common enough, it is true, among savages, and not unusual even in the olden

Hill *vs.* The State of Georgia.

time, when every man was at war with his neighbor, but utterly useless and disgraceful in a well ordered and civilized community. We suppose that in view of what they deemed a necessity of a free state, to-wit: the existence of a, well regulated militia, they guaranteed to the people, not only the right to have and keep arms, but the right so to use them as to become familiar with that use, so that when an exigency of the state arose, they would be ready and capable for its defense. And we are driven, for these reasons, to the conclusion, that the right to keep and bear arms is not infringed if the exercise of it be by law prohibited at places and times when a proper respect for the majesty of the law, a sense of decency and propriety, or the danger of a breach of the peace, forbid it.

We have thus far considered the question as though the provision referred to had no other limitations than those deduced from the preamble, from the nature of the right and from the other duties cast by the constitution upon the legislature. But it must be remembered that as a qualification to the very guarantee itself, it is expressly and in terms provided, that " the general assembly may prescribe the *manner* in which arms may be borne." It is contended that this is only a permission to the legislature to prohibit the carrying of arms secretly upon the person. But it seems a very unfair criticism upon the language used so to confine it. One cannot help inquiring why, if this alone was the intent, apt and proper words expressing it, were not used. It would have been more simple and more apt to say " but the legislature may prohibit, by law, the carrying of arms secretly upon the person." Instead of this, the words used are " the legislature may prescribe the manner in which arms may be borne," implying more than one prohibition, and conveying the idea of various restrictions upon the general guarantee. If the words " manner of bearing arms" covers only the particular way in which they may be carried upon the person, as openly or secretly, on the shoulder or in the hand, etc., it would be illegal for the legislature to prohibit one from going into a crowd

with a loaded pistol cocked and capped and set with a hair trigger, since this would not be a restriction on the mode of carrying, but upon the kind of pistol carried, and yet we doubt if any court would hesitate to say that such an act might not be prohibited, nay, it would, under the general rules of law, be a piece of criminal negligence, that in case of an accident, causing death, would go far to make the offender guilty of murder. We do not think the words "manner of bearing arms," have any such confined and limited signification. The words are used in their ordinary signification, and were intended to limit the broad words of the previous guarantee. Those words had granted the right "to keep and to bear arms." As we have seen, the object of the provision was to secure to the state a well regulated militia. The simple right to carry arms upon the person, either openly or secretly, would not answer the declared purposes in view. Skill and familiarity in the use of arms was the thing sought for. The right to "tote" them, as our colored people say, would be a bootless privilege, fitting one, perhaps, for playing soldier upon a drill ground, but offering no aid in that knowledge which makes an effective, to-wit: a shooting soldier. To acquire this skill and this familiarity, the words "bear arms" must include the right to load them and shoot them and use them as such things are ordinarily used, so that the "people" will be fitted for defending the state when its needs demand; and when the constitution grants to the general assembly the right to prescribe the manner in which arms may be borne, it grants the power to regulate the whole subject of using arms, provided the regulation does not infringe that use of them which is necessary to fit the owner of them for a ready and skillful use of them as a militiaman. Any restriction which interferes with this is void, whether it relates to the carrying them about the person, or to the place or time of bearing them.

The manner of bearing arms includes not only the particular way they may be carried upon the person, that is openly or secretly, on the shoulder or in the hand, loaded or

unloaded, cocked or uncocked, capped or uncapped, but it includes, also, the time when, and the place where, they may be borne. It is no reply to this view of the subject to say that if the legislature may do this, they may, in effect, prohibit the carrying them altogether. The same reply may be made to the admitted right to prescribe the manner of carrying arms upon the person. If the legislature were to say arms shall not be borne on the shoulder, nor in the hands, or on the arms, but they shall only be borne strapped or fastened upon the back, this would be prescribing only the manner, and yet, it would, in effect, be a denial of the right to bear arms altogether. The main clause and the limitation to it are both to be construed reasonably, and in view of the declared object of the provision. Any act would violate it that militated against the purpose, and no act is in violation of it that leaves the citizen the right to keep arms; and so to carry and use them as will render him familiar with their use, so as that he will be prepared for public service as a militiaman when needed. Within their limits, the legislature may prescribe the manner of bearing arms, including in this manner the mode in which they shall be carried upon the person, and the time, place and circumstances in which they may be borne. Nor is this an unfair or unusual sense of the word manner. In that "well of English undefiled," the common version of the Bible, from whence, without question, the great mass of our people get the use and meaning of words, more than from any other example, the word manner is often used in this signification.

In Numbers, 9th chapter, 14 verse, it is commanded that a stranger shall keep the passover according to the *manner* thereof, to-wit: as described in the 11th verse of the same chapter; and in Exodus, 12th chapter, 3–11: "On the 14th of the second month, at even, in a house, with the loins girded, the shoes on the feet, a staff in hand and in haste." So in the 4th chapter of Ruth, Boaz had, with his kinsman, gone to the *gate of the city* into the presence of the elders, and there, his kinsman, had pulled off his shoe to Boaz, in order to re-

lease his claim upon certain land which had belonged to the family of Ruth's husband; and the 7th verse says: "Now this was the *manner* in former times in Israel concerning redeeming and changing, and confirming all things."

In Deuteronomy 25th chapter, 7th and 9th verses: This "manner" is prescribed in detail, and includes the place, the persons present and the special act to be done, to-wit: pull-off the shoe, and passing it. So in 1st Samuel 8th and 9th verses, Samuel undertakes to tell the Jews "the manner of the king" they were longing for, and he proceeds to present him as a tyrant who would do as he pleased with their sons and daughters, their servants and their lands and themselves. So Christ was buried as the *manner* of the Jews was to bury, including the time and place, the spices and the tomb: John 19th chapter and 40th verse. So the water-pots, the contents of which were turned into wine, were after the "manner of purifying of the Jews:" John 2d chapter and 6th verse. So it is said in Hebrew, 1st chapter and 1st verse: "God who, at sundry times and in divers *manners*, hath *spoke* to your fathers by the prophets." This, without doubt, includes not only when he spoke to Moses, "mouth to mouth apparently, and not in dark speeches," but when he revealed himself by dreams or visions, by his finger on the tables of stone on the mount, or by Urim and Thummin, in the holy place. And it will be found that the "manner" of doing a thing often, both in looks and in speech, includes the time and place as well as the precise detail of the special act itself. If I were to ask an old farmer his manner of sowing turnips, is it supposable that he would leave out the time, the dark nights in August, or the character of the land, and the mode of preparing it? We think, therefore, that under the power expressly granted to prescribe the manner in which arms may be borne, the legislature may prescribe, not only that they shall be borne openly and plainly exposed to view, but that it may prohibit the bearing at such times and places, and under such circumstances, as is necessary for the preservation of the peace, the protection of the person and property of the

citizens, and the fulfillment of the other constitutional duties of the legislature, provided the restriction does not interfere with the ordinary bearing and using arms, so that the "people" shall become familiar with the use of them.

Judgment affirmed.