## ATLANTIC COAST LINE RAILROAD CO. *v.* THE STATE.

1. A duly enrolled act, properly authenticated by the regular presiding officers of both houses of the General Assembly, approved by the Governor, and deposited with the Secretary of State as an existing law, will be conclusively presumed to have been enacted in accordance with constitutional requirements; and it is not permissible to show by the legislative journals, or other records, that it did not receive on its passage a majority vote of all the members elected to each house, or that there was any irregularity in its enactment.
2. An act provided "That all railroad companies are hereby required to equip and maintain each and every locomotive used by such company to run on its main line after dark with a good and sufficient headlight which shall consume not less than three hundred watts at the arc, and with a reflector not less than twenty-three inches in diameter, and to keep the same in good condition." It also provided that "any railroad company violating this act in any respect" should be liable to indictment and a prescribed punishment, and that "This act shall not apply to tramroads, mill-roads, and roads engaged principally in lumber or logging transportation in connection with mills." *Held:*
  (a) The term "railroad company" employed in the act includes natural persons as well as corporations.

35

(*b*) The act is not void as being violative of the equal-protection clauses of the State and Federal constitutions because it exempts from its operation tramroads, mill-roads, and roads engaged principally in lumber or logging transportation in connection with mills.

(*c*) Even if receivers of railroads are not within the operation of the act, it would not for this reason be violative of the equal-protection clauses referred to in the preceding note.

3. The act is not violative of the due-process clauses of the State and Federal constitutions because its enforcement will require a loss of property to the defendant in doing away with the headlights on locomotives now in use and cause the defendant to incur expense in equipping its locomotives with the headlights required by the act.

(*a*) The act is not violative of the due-process clauses of the State and Federal constitutions because it requires an arc electric headlight which shall consume "not less than three hundred watts at the arc and with a reflector not less than twenty-three inches in diameter," on the ground that it deprives the defendant "of its own right to make contracts and manage its own business."

(*b*) The act was passed in the legitimate exercise of the police power of the State, and is not void on the ground that its requirements are unreasonable.

(*c*) Nor does the act violate the due-process clauses of the State and Federal constitutions on the ground that it contains no emergency clause, and absolutely and without exception makes the railroad company guilty of a crime if it operate one of its engines on its main line after dark without the required headlight.

4. The act does not violate the "commerce clause" of the Federal constitution on the ground that it would require at the State line a change of headlights on locomotives doing an interstate business if other States required headlights of a kind different from that prescribed by the act in question, although such change might involve some loss of time and expense on the part of the railroad company.

DECEMBER 16, 1910.

Questions of constitutional law; from Court of Appeals (2444).

The Court of Appeals certified to this court for its instruction thereon the following questions of law, the determination of which is deemed necessary to a proper decision of the above-stated case.

"1.  Is what purports to be an act of the General Assembly, approved August 17, 1908, and found in the published Acts of 1908, pp. 50, 51, commonly known as the 'headlight law,' a law of this State, as against the specific contention presented in this case that it did not receive on its alleged passage a majority of the votes of all the members elected to the. Senate, within the purview of and according to the provisions of art. 3, sec. 7, par. 14, of the constitution of this State (Civil Code, 1895, § 5777), and that it so affirmatively appears from the journals of the General Assembly, especially

the Senate Journal for 1908, pp. 132, 163, 203, 204, 339, 340, 700, and 701?

"2.  Is said act void as being in contravention of art. 1, sec. 1, par. 3, of the constitution of Georgia (Civil Code, 1895, § 5700), which provides: 'No person shall be deprived of life, liberty, or property, except by due process of law,' as against the contention of the defendant (a railway corporation) that the said enactment requires defendant to discontinue the use of property already furnishing a sufficient and adequate headlight, forces defendant to abandon the use of material adequate and sufficient for the production of safe and sufficient headlight, compels defendant to purchase expensive machinery for the purpose of generating a specific current of electricity as a means for lighting headlights, and compels defendant to purchase a reflector of a size designated by the statute,—thus not only depriving the defendant of the right to use property already owned, but compelling it to purchase property of a given description and depriving it of its own right to make contracts and manage its own business?

"3.  Is said act void because it violates the provisions of art. 1, sec. 1, par. 2, of the constitution of Georgia (Civil Code, 1895, § 5699), which provides that 'Protection to person and property is the paramount duty of government, and shall be impartial and complete,' as against the contention that the said act does not apply equally to all persons and corporations in the same class or similarly situated; said act makes an unreasonable and arbitrary classification, whereby it excludes from the operation of said act persons owning and operating railroads, and likewise excludes from the operation of said act receivers operating railroads, even though said receivers operate fast trains through cities, towns, and thickly settled districts of the State; nor does said act apply to 'tramroads, mill-roads, or roads engaged principally in lumber or logging transportation in connection with mills,' even though locomotives thereon, for a whole or part of their route, may be operated at a fast schedule, and through thickly populated districts?

"4.  Is said act void because it violates the provisions of the 14th amendment to the constitution of the United States, which provides that 'No State  .  .  shall deprive any person of life, liberty, or property without due process of law,' on the alleged ground that the said act requires defendant to discontinue the use

of property lawfully acquired and lawfully held, although furnishing sufficient and adequate headlight; forces defendant to abandon the use of lamps, reflectors, headlights, and material lawfully held, although adequate and sufficient for the production of safe and sufficient headlight and reasonably adapted to the protection of person and property, whether on the track or on the locomotive and cars; compels defendant to purchase expensive machinery for the purpose of generating a specific current of electricity, and to purchase a reflector of a size designated by the statute, thereby depriving defendant of its right to make contracts and to manage its own business?

"5.    Is said act void because it violates the provisions of the 14th amendment to the constitution of the United States, which declares: 'No State . . shall deny to any person within its jurisdiction the equal protection of the laws,' on the alleged ground that the said headlight law does not apply equally to all persons and corporations in the same class or similarly situated: said act makes an unreasonable and arbitrary classification whereby it excludes from the operation of said act persons owning and operating railroads, and likewise excludes from the operation of said act receivers operating railroads, even though said receivers operate fast trains through cities, towns, and thickly settled districts of the State; nor does said act apply to tramroads, mill-roads, or roads engaged principally in lumber or logging transportation in connection with mills, even though the locomotives used thereon, for a whole or part of their route, may be operated at fast speed and through thickly populated districts?

"6.    Is said act void because repugnant to art. 1, sec. 8, par. 3, of the constitution of the United States, which provides that: 'Congress shall have power to regulate commerce with foreign nations, among the States, and with the Indian tribes,' on the alleged ground that the enforcement of said statute and said statute itself interferes with and regulates interstate commerce; hinders and delays the running of locomotives having no such headlight as is required by said statute, although said locomotives are lawfully engaged in hauling cars and trains for interstate commerce; makes it unlawful for defendant or other companies operating interstate railways to use, in the State of Georgia, locomotives having no headlight of the kind described in said alleged enactment, although

said locomotives are lawfully used up to the State line—all with the result of delaying interstate commerce and rendering it impossible for interstate railroad companies, crossing the Georgia line, to conduct their interstate business with usual, customary, and proper dispatch?

"7. The plaintiff in error contends that the act in question was never passed by both houses of the General Assembly, according to the method prescribed in the constitution and set out in the 1st question above; the specific contention being: that it passed the lower house regularly in the form now appearing in the printed acts; that in the Senate, the committee to which it was referred reported adversely to the passage of the bill; that the Senate disagreed to the report of the committee, and the bill went to second reading; that at the third reading a substitute was offered and adopted; the bill then passed by substitute, forty senators voting for it in this shape; the bill was transmitted to the House for concurrence in the substitute; the House refused to concur; thereafter the Senate took up the bill for the purpose of receding from the substitute; the motion to recede prevailed by a vote of 18 to 12. No further action appears. The defendant at the trial in the court below offered to set up, by special plea in bar, that the substitute passed by the Senate was materially different in its provisions from the bill as passed by the House, and to prove this fact by the exhibition and introduction in evidence of a certified copy of the substitute as filed in the office of the secretary of State. Was the special plea setting up this fact subject to be stricken on general demurrer thereto; and was the certified copy of the substitute admissible in evidence for the purpose of supplementing, varying, or explaining the entries in the journal of the Senate; and would it, if it had been admitted, and had established that the bill as passed in the Senate by substitute was materially different from what it was as originally passed by the lower house, have impeached the validity of the act, under the circumstances recited above?

"8. It appears from the record that the defendant was engaged in interstate commerce; that it failed to equip one of its locomotives engaged in that interstate commerce with a headlight of the standard required by the act in question. Was the defendant, as to this locomotive while so engaged in interstate commerce (it being run partly in this State and partly in South Carolina), exempt

from the provisions of the act, on the ground that to apply the law to the operation of this locomotive as so engaged would be violative of the provision of the constitution of the United States quoted above, conferring upon Congress exclusive power to regulate interstate commerce?

"9.   Where it appears from the proof that the defendant's locomotives were, prior to the passage of the act, equipped with oil-burning headlights, or with electric headlights different from that prescribed by the act in question, is it any defense to a prosecutor under the act that these headlights have, in the experience of the defendant and other railroad companies, usually proved reasonably safe and efficient (there being proof, however, that headlights of the prescribed standard are more efficient), and that to substitute electric headlights of the standard prescribed would entail expense of greater or less amount; the contention of the defendant being that to enforce the act under the circumstances would amount to depriving the defendant of its property without due process of law, in violation of the 14th amendment to the constitution of the United States and in violation of art. 1, sec. 1, par. 3, of the constitution of this State; because it renders the value of the old headlights less or totally destroys it, and entails upon the defendant the expenditure of large sums of money, and deprives the defendant of the right to regulate its own business and affairs, and causes it to submit to an arbitrary and unreasonable regulation thereof?"

*McDaniel, Alston & Black* and *Joseph R. Lamar,* for plaintiff in error.

*J. C. C. Black Jr., solicitor,* and *T. S. Felder,* contra.

HOLDEN, J.   1. The act referred to in the questions propounded by the Court of Appeals, known as the "headlight law," was duly deposited in the office of the secretary of State as an enrolled act of the General Assembly, after having been duly signed by the president of the Senate and the speaker of the House of Representatives, and approved by the Governor.   The provision of the constitution referred to in the 1st question propounded is as follows: "No bill shall become a law unless it shall receive a majority of the votes of all the members elected to each house of the General Assembly, and it shall, in every instance, so appear on the journal."   Civil Code, § 5777.   An act with the status above named can not be attacked as being invalid, under the constitu-

tional provision above quoted, by showing that the journal of the Senate affirmatively shows that it did not receive on its passage the vote of a majority of all of the members elected to that body. When an enrolled act is signed by the presiding officers of both houses, approved by the Governor, and deposited in the office of the secretary of State, it will be conclusively presumed that the measure was properly put to a vote in both houses, and that it received a constitutional majority; and the court will not upset the act because the journals of the houses happen to show that it did not receive a majority of the votes of either or both branches of the legislature. 36 Cyc. 971 (G. b). The presiding officer of each branch of the General Assembly, and the Governor, are sworn officers of the State, and it is to be presumed that an enrolled act would not have been signed by these officials and thereby authenticated as being a valid law unless the act on its passage had received the number of votes which the constitution requires in order to enact it. It will be deemed more likely that the subordinate officers of the General Assembly, in the performance of clerical duties, should have made a mistake in recording on the journals the proceedings had by the respective legislative bodies, than that the sworn presiding officers of these bodies should have signed a duly enrolled act as having been lawfully enacted when it did not in fact receive the number of votes required by the constitution in order to insure its passage. In the case of *DeLoach* v. *Newton*, 134 *Ga.* 739 (68 S. E. 708), it was held: "If an enrolled act of the legislature was duly signed by the president of the Senate and the speaker of the House and approved by the Governor and deposited in the office of the secretary of State, it was not competent to attack its validity on the ground that the legislative journals showed that the bill originated in the House, was there passed by a constitutional majority, and transmitted to the Senate, where it was amended and passed by a constitutional majority, and then transmitted to the House, where the Senate amendment was concurred in, but failed to show that this was done by a constitutional majority." See also *Whitley* v. *State*, 134 *Ga.* 758 (68 S. E. 716).

If an act is not invalid under the provisions of the constitution above quoted when the legislative journals fail to show that it received a constitutional majority, it would not be invalid when the journals affirmatively show that it did not receive such majority. If

it were permissive to look to the legislative journals to ascertain what occurred with respect to the passage of the act, after it had been duly enrolled, signed, approved, and deposited with the secretary of State as an existing law, an affirmative showing on the journal that a measure did not receive the requisite constitutional majority would be no more fatal to the validity of the act than a failure of the journal to show that it did receive such majority, where the attack is based on a constitutional provision that no bill shall become a law unless it shall receive a majority of the votes of all the members elected to each house of the General Assembly, "and it shall, in every instance, so appear on the journal."

The 1st question propounded by the Court of Appeals must be answered in the affirmative. In answering this question, having ruled that an enrolled act duly signed by the presiding officers of both houses, approved by the Governor, and deposited with the secretary of State is conclusively presumed to be a valid law so far as its enactment is concerned, the special plea referred to in the 7th question was subject to be stricken on the general demurrer thereto, and the certified copy of the substitute referred to in the 7th question was not admissible in evidence "for the purpose of supplementing, varying, or explaining the entries in the journal of the Senate." This ruling makes it unnecessary to determine whether or not the journal of the Senate shows that the act in question was, or was not, in fact passed in conformity to the above quoted provision of the constitution.

2. The full text of the title and the body of the act referred to in the questions propounded to us is as follows:

"An act to require all railway companies in the State to equip and maintain each and every locomotive used with sufficient electric headlight, to prescribe a punishment for the failure to so equip, and for other purposes.

"Section 1. Be it enacted by the General Assembly of Georgia, and it is hereby enacted by authority of the same, that all railroad companies are hereby required to equip and maintain each and every locomotive used by such company to run on its main line after dark with a good and sufficient headlight which shall consume not less than three hundred watts at the arc, and with a reflector not less than twenty-three inches in diameter, and to keep the same in good condition. The word main line as used herein means all

portions of the railway line not used solely as yards, spurs, and sidetracks.

"Sec. 2. Be it further enacted, that any railroad company violating this act in any respect shall be liable to indictment as for a misdemeanor in any county in which the locomotive not so equipped and maintained may run, and on conviction shall be punished by fine as prescribed in section 1039 of the Code of 1895.

"Sec. 3. Be it further enacted, that this act shall go into effect July 1, 1909.

"Sec. 4. Provided, this act shall not apply to tramroads, millroads, and roads engaged principally in lumber or logging transportation in connection with mills.

"Sec. 5. Be it further enacted, that all laws and parts of laws in conflict with this act be and the same are hereby repealed."

The act requires "all railroad companies" to equip every locomotive used by "such company to run on its main line" after dark with a light of the kind named, and provides that "any railroad company" violating the act shall be liable to indictment and to be punished by fine as prescribed in the Penal Code, § 1039. Does the term "railroad company" include a natural person, so that the latter would be subject to indictment if such natural person owned and operated a railroad and failed to comply with the provisions of the act? In construing the term "railroad company," we should look to all the provisions of the act and give proper consideration to the object intended to be accomplished by the act. Section 4 of the act provides: "Provided, this act shall not apply to tramroads, mill-roads, and roads engaged principally in lumber or logging transportation in connection with mills." It should be observed that in making this exception the act does not say that the owner or operator of the roads designated should be excepted, but simply provides that "this act" shall not apply to such "roads," indicating that the purpose of the act was to make the requirement in reference to the use of the named headlights on all other railroads, regardless of whether owned by a corporation or natural persons. The evident purpose was to except certain roads, but not to make any exception in favor of any particular owners of other roads. The object of the act was to require certain headlights on all railroads except those of a named class, and the term "railroad company" was intended to include natural persons as well as cor-

porations. The word "company" does not necessarily mean a corporation. It may mean a firm or partnership. 8 Cyc. 389. If it includes a firm or partnership of two or more individuals, why should it not include one individual? Penal Code, § 1, par. 4, provides: "The singular or plural number shall each include the other, unless expressly excluded." Penal laws should be construed strictly, but they should not be so construed as to defeat the obvious intention of the General Assembly. In construing an act, whether of a civil or penal nature, the intention of the General Assembly should be sought for, keeping in view the evil and the remedy. The evil against which protection is sought is the operation of engines without the headlight required by the act. · The purpose of the law was to require named headlights on engines on the main line of all railroads except those of a specified character, and it was not the intention to make this requirement of corporations and companies, and make no such requirement of an individual owning and operating a railroad. The Civil Code, § 2199, provides that the terms railroad "corporation" and "company," used in the article in which such section appears, shall include in their meaning any individual or individuals owning and operating railroads. Much of the law of this State pertaining to the operation of railroads, including the right of condemnation of private property, what is familiarly known as the "blow-post" law, requirements as to the furnishing of heat and light in railroad trains, are embraced in this article. We think the word "company" in the act in question was used in the sense referred to in the Civil Code, § 2199, as including "individuals." In this connection, see State v. Stone, 118 Mo. 388 (24 S. W. 164, 25 L. R. A. 243, 40 Am. St. R. 388) ; Chicago &c. Co. v. Garrity, 115 Ill. 155 (3 N. E. 448) ; Lewis v. Northern Pac. Ry. Co., 36 Mont. 207 (92 Pac. 469) ; Singer Mfg. Co. v. Wright, 97 Ga. 114 (25 S. E. 249, 35 L. R. A. 497).

The act does not violate the equal-protection clauses of the State and Federal constitutions because it provides: "Provided this act shall not apply to tramroads, mill-roads, and roads engaged principally in lumber or logging transportation in connection with mills." The roads to which the act does not apply do not serve the public generally, but their work is mainly that connected with lumber mills. Their principal business is not the transportation of

passengers and freight for the public, but involves work for private enterprises in a small territory. The danger of operating such roads without proper safety appliances is not so great as that attending the operation of ordinary railroads doing a general passenger and freight business for the public. These differences furnish a reasonable basis for requiring a headlight of a certain kind on engines on main lines on ordinary railroads, and not requiring such lights on engines on roads of the kind excepted. The latter form an entirely separate and distinct class of railroads from the former, and the act can not be said to make an arbitrary classification. N. Y. &c. R. Co. v. New York, 165 N. Y. 628 (17 Sup. Ct. 418, 41 L. ed. 853); Missouri &c. R. Co. v. State (Ark.), 121 S. W. 930; People v. N. Y. &c. R. Co., 55 Hun, 409, 608 (8 N. Y. Supp. 673); Chicago &c. Ry. Co. v. Railroad Commissioners (Ind.), 90 N. E. 1011.

Conceding, without deciding, that receivers of railroads are not within the provisions of the act, we do not think this fact would make the act void as a violation of the equal-protection clauses of the State and Federal constitutions. A receiver appointed by a court is one of its officers; and in the absence of any statute imposing a duty on a receiver of a railroad thus appointed, he must handle the property placed in his charge in accordance with the instructions of the court appointing him. His possession and operation of the road are those of the court. Should the court, through its receiver, have possession of a railroad whose engines were not equipped with the required headlight, or purchase other engines, the presumption is that the court—a branch of the government co-ordinate with the General Assembly—would conform to the policy of the State as declared by the General Assembly, in the exercise of the police power, and equip the engines with such headlights as it had by law required of railroad companies. A railroad is never retained possession of and operated by the court longer than is necessary. The court does not permanently operate railroads; on the contrary, it only operates them for a short time and from necessity. If the act applies to a receiver, and if a receiver were appointed by the court for a railroad whose engines were not equipped with the required headlights, how could such receiver operate the engines without such lights without subjecting himself to numerous prosecutions and fines, should the court require

him to operate the engines in violation of the penal laws of the State? If it were a railroad engaged in serving the public, the latter might suffer to a great extent if the road were not operated until all the engines were equipped with the required headlights. The act provided that it should not go into effect until a specified date, and thus time was given to railroad companies to equip their engines in accordance with its provisions. But after the act went into effect, if a receiver were appointed for a railroad whose engines were not thus equipped, no time is allowed within which the receiver might comply with the act; and if the act applies to receivers, they would become subject to criminal prosecutions the day they were appointed, if they operated engines without the prescribed equipment, in disregard of the act. The court would dispose of a railroad under receivership as soon as it was proper and practicable to do so. Those to whom the receiver delivered it, under a contract of purchase or otherwise, would be subject to numerous prosecutions under the act in question should they not equip the engines as required by that law, and the public might seriously suffer if the road should cease operations until its engines could be thus equipped. It is to be presumed that the court would not allow the road to be disposed of before its engines were equipped with headlights as required by the act. It is not to be presumed that it would dispose of the road to another when it was in such condition that the one acquiring it would violate the penal law of the State by immediately operating it. Receivers, and courts through receivers, do not construct or buy railroads, but their ultimate aim is to get rid of the ones of which they are in possession. Courts, through receivers, never operate railroads except from necessity; and when they do so operate them, it is only for a limited time. If the court takes possession of a road whose engines are not equipped as required by the "headlight law," the court should not require its receiver to cease operating the road until the engines should be so equipped, thereby causing inconvenience and suffering to the public. In such cases the court should yield to the necessity of the situation as it existed when thrust upon it, by immediately operating the road, where possible, to subserve the public convenience and requirements, and impose upon the receiver the duty of equipping engines as rapidly as possible in accordance with the policy of the law; so as to put the road

in a condition where its operation can be continued by those who take charge of it when disposed of by the court, without involving a violation of law on their part. We think there was a reasonable basis for a requirement that railroad companies should equip their engines operated on main lines as prescribed in the act, without making such requirement applicable to receivers of railroads. The answer to the 3rd and 5th questions must be in the negative.

3. All property is held subject to the police power of the State. The determination by the railroad company that the reflector and the light in use by it constitute an adequate light can not be conclusive on the General Assembly, which has the authority to exercise the police power of the State, and in the interest of public safety to declare such light inadequate. It is a matter of great importance for the protection of persons and property in the train, the persons on the locomotive, persons and property on the track, and persons and property on other trains with which a collision may be had, that there should be an adequate headlight on such locomotive. The General Assembly, in the exercise of the police power of the State, has the right to require adequate head-lights on such engines; and if in conformity to the requirements of such law the railroad company is compelled to do away with the headlights already in use by it and substitute others therefor at its own expense, there is no taking of property without just compensation, in violation of the due-process clauses of the State and Federal constitutions. In such a case, there is no taking of property. The due-process clauses are not intended to limit the right of the State to properly exercise the police power in the enhancement of the public safety. The fact that the railroad company will, in order to equip its engines with the required head-lights, be forced to do away with the reflectors and lights which it has in use is only incidental to a compliance with the police regulation and requirement made in the act, which is a valid and reasonable requirement. Damages can not be recovered by one because he incurs expense in obeying a police regulation enacted for the common welfare and safety of the public. See, in this connection, State v. St. Paul etc. Ry. Co., 98 Minn. 380 (108 N. W. 261, 120 Am. St. R. 581, 8 Am. & Eng. Ann. Cas. 1047); 1 Thomp. Corp. § 449; C., B. & Q. R. Co. v. Chicago, 166 U. S. 226 (17 Sup. Ct. 581, 41 L. ed. 979); C., B. & Q. Ry. v. Drainage Commis-

sioners, 200 U. S. 561 (26 Sup. Ct. 341, 50 L. ed. 596), and authorities cited in the opinion; Bacon *v.* Boston & M. R. (Vt.), 76 Atl. 128 (19). The act provides that every engine used on a main line after dark shall be equipped "with a good and sufficient headlight, which shall consume not less than 300 watts at the arc, and with a reflector not less than 23 inches in diameter." It is not required that the light shall consume no more than the specified number of watts at the arc, nor that the reflector shall be exactly a particular size. A light consuming more than 300 watts at the arc, and a reflector greater than 23 inches in diameter would be within the provisions of the act. The act requires "a good and sufficient headlight." In the exercise of the police power the General Assembly had the right to prescribe that such light should be an electric light. The fact that the railway company is prevented from providing a light produced in some way other than by electric current is no violation of the due-process clause "by depriving it of its own right to make contracts and manage its own business." In McGehee on Due Process of Law, 345, it is said: "Although freedom and the liberty to contract are fundamental rights within the guaranties of the constitution, they may be limited by the State in the exercise of the police power in the interest of the public safety, health, or morals, or, under certain conditions, in the exercise of the legislative power merely." Also see Freund on Police Power, § 499. It is to be presumed that the General Assembly satisfied itself that the light proper to be used in order to insure the public safety was the one required, and in the exercise of the police power it had the right to require the use of such light. The fact that in obeying the law the railroad company is deprived of the right to use a light other than an electric headlight, or to use an electric light below a specified intensity, or a reflector of less than a designated size, does not violate the due-process clause of the State and Federal constitutions. The legislature has the power to require such a headlight as is best promotive of the public safety, if the requirement is a reasonable one. An act requiring in general terms a light adequate for such purposes would be very indefinite and would give rise to frequent disputes as to whether or not the law had been observed. A jury in one instance might declare the light in use inadequate, while another jury might declare it adequate, and the user of the light

might be uncertain as to whether or not he was complying with the law. In Atchison &c. Railroad Co. v. Matthews, 174 U. S. 96, 102 (19 Sup. Ct. 609, 612, 43 L. ed. 909), the Supreme Court of the United States said: "If, in order to accomplish a given beneficial result—a result which depends on the action of a corporation—the legislature has the power to prescribe a specific duty and punish a failure to comply therewith by a penalty, either double damages or attorney's fees, has it not equal power to prescribe the same penalty for failing to accomplish the same result, leaving to the corporation the selection of the means it deems best therefor? Does the power of the legislature depend on the method it pursues to accomplish the result? As individuals we may think it better that the legislature prescribe the specific duties which the corporations must perform; we may think it better that the legislation should be like that of Missouri, prescribing an absolute liability, instead of that of Kansas, making the fact of fire prima facie evidence of negligence; but clearly as a court we may not interpose our personal views as to the wisdom or policy of either form of legislation. It can not be too often said that forms are matters of legislative consideration; results and power only are to be considered by the courts." In Freund on Police Power, § 34, it is said: "Assuming that several measures are equally efficient to avert danger to health or safety, it would still seem to be within the legislative power to select one method and require its adoption; for it is easier to enforce uniform police regulations than a great variety of measures, the efficiency of each of which would be a question of fact in each particular case." Requiring a light by virtue of which those on an engine can see a designated distance ahead is practically done by requiring that the light shall be of a certain intensity and with a reflector of not less than a given size. The act declares that the light which is considered proper for the public safety must be of the kind required. The General Assembly is presumed to have acted after due deliberation and investigation, and after finding that the light proper for the public safety must be of the kind prescribed. The courts can not say that an electric light, and one of the intensity provided, with a reflector of the size named, is not one necessary for the public safety; nor can we say that the requirement that such a light shall be used on locomotives is an unreasonable requirement, although the act in preventing

the use of lights other than an electric light affects the right of the
company to contract for any other kind of light.   The act is not
void for the alleged reason that the government is undertaking to
manage the company's business and interfere with its right to con-
tract.   In 1 Thompson on Corporations (2d ed.), § 425, it is said:
"The legislature may exercise its discretion within wide limits
in its regulations of corporations under this police power.   If the
statute appears to be within the apparent scope of such power, it is
not for the courts to inquire into its wisdom and policy, or to sub-
stitute their discretion or judgment for that of the legislature.
.   .   The correct doctrine undoubtedly is that it is for the legisla-
ture to determine the exigency, or the occasion, for the exercise of
this power; but it is clearly within the jurisdiction of the courts to
determine what are the subjects upon which this power is to be
exercised, and the reasonableness of that exercise."   And in sec-
tion 426, the same author says: "The position of the courts in
passing on the validity of statutes enacted by the legislature in the
exercise of this police power is regarded by them as both delicate
and embarrassing.   Courts should be, and are, slow to pronounce
judgment upon what is purely legislative discretion.   It is sufficient
to stay the hands of the courts if the exercise of this power by the
legislatures is reasonable.   And in judging of its reasonableness
courts will not look closely into mere matters of judgment where
there may be a reasonable difference of opinion.   The courts will as-
sume that this power will always be exercised by the legislature
with the highest discretion; and the rule is that where the legis-
lative expression is clear and unequivocal, a clear case should be
made to authorize an interference by the courts upon the ground of
unreasonableness.   The courts should and do proceed with the ut-
most caution, and hold such regulations void only when they clearly
pass beyond the limits of the police power and infringe upon rights
secured by the Federal law.   This power rests solely within the leg-
islative discretion, inside constitutional limits.   It is for the legisla-
ture to determine when the public safety or welfare requires the ex-
ercise of this power, and the courts can interfere only when such
exercise conflicts with the constitution; with the necessity, wisdom,
or policy of such legislation they have nothing to do."   The need
for the exercise of the police power upon any given subject is a
matter in the discretion of the legislature.   The exercise of this

power must be reasonable, and the question as to whether or not it is reasonable is one for the courts. We can not say that the exercise of the power in this instance was unreasonable. In Holden v. Hardy, 169 U. S. 366, 397 (18 Sup. Ct. 383, 390, 42 L. ed. 780), the following language of the Supreme Court of Utah was approved: "Though reasonable doubts may exist as to the power of the legislature to pass a law, or as to whether the law is calculated or adapted to promote the health, safety, or comfort of the people, or to secure good order or promote the general welfare, we must resolve them in favor of the right of that department of government." The legislature has the right to prevent railroad companies from contracting for and using a light not proper to be used for the public safety; and if the light required is one proper for this purpose, the legislature has the right to require its use, notwithstanding this prevents the use of another kind of light, if the requirement of the act is reasonable, and we can not say that its requirements are unreasonable.

The act is not void on the ground that it absolutely and without exception makes the company guilty of a crime when it fails to equip its locomotives with the required headlights and operates them on its main line without such headlights. It is contended that the act is void for the reason that in case of accident or other unforeseen cause, if the light which the company had provided in conformity with the requirements of the act were injured or destroyed, no provision is made allowing the company to operate its engine without the required headlight to a repair-shop, or to the place where another engine could be obtained, without violating the act and becoming liable to punishment thereunder. Every statute must be construed to have a reasonable intendment, and be construed in connection with other statutes. While we will not undertake to detail instances in which the company would be guilty of no offense under the act in question while operating an engine without the required headlight, an act will not be construed so as to require the performance of an impossible act, if any other construction can be legitimately given it. See Southern Ry. Co. v. Atlanta Sand Co., 135 Ga. 36 (68 S. E. 807). The statutes requiring railroad companies to erect blow-posts 400 yards on either side of public crossings and to blow the whistle on approaching such crossings, to furnish light and water for pas-

sengers, and other statutes imposing duties on railroad companies, and providing a penalty for violation thereof, contain no emergency clauses; and there are many statutes making the commission of specific acts crimes without providing that there are circumstances under which a technical violation of the letter of the act would constitute no crime; but we are not prepared to hold that such acts are void for this reason. As to whether in any particular instance a person charged with violating a criminal statute has a good defense thereto must depend upon the particular facts in each case. We do not think that the act is violative of the due-process clauses of the State and Federal constitutions; and our answer to the 2d, 4th, and 9th questions must be in the negative.

4. The commerce clause of the Federal constitution is a limitation on, but is not a destruction of, the police power of the States. The police power has never been surrendered by the States. A railroad company driving an engine engaged in interstate commerce through the territory of this State, with a headlight which endangers the lives and property of the people, can not claim that under the commerce clause of the Federal constitution it is not subject to reasonable police regulations of this State requiring an adequate headlight for the protection of the lives and property of the people. The act in question does not restrict or prohibit interstate commerce. It is an exercise of the police power, designed to protect persons and property in this State, and does not prohibit or regulate interstate commerce. The statute is not directed against interstate commerce; so far as the act affects interstate commerce, it is in aid thereof. It protects the persons and property on trains brought from another State into this State, as it also does persons and property not so brought; and it is the duty of the State to protect the former as well as the latter. One of the highest duties of government is the protection of the lives and property of the people. To the exercise of the police power all rights of natural persons and corporations are subject. If an engine doing an interstate business should come into this State from another State, or go out of this State into another State, when such other State had a law requiring a headlight on the engine other than an electric light and a reflector of a size different from that required by the act in question, the mere fact that this would necessitate changes of lights and reflectors, thereby causing expense, loss of

time, and inconvenience, would not for this reason make the requirement of the act an unlawful interference with interstate commerce. People v. N. Y. &c. R. Co., 55 Hun, 409, 608 (8 N. Y. S. 673) ; N. Y. &c. R. Co. v. New York, 165 U. S. 628 (17 Sup. Ct. 418, 41 L. ed. 853). Many acts requiring trains doing an interstate business to stop at stations and public crossings, and to run at not exceeding a specified rate of speed, have been held not to be violative of the commerce clause. Such acts, however, necessarily to some extent prevent such trains from making the time they would make but for such stops and slowing up of speed, and also of necessity involve some expense. A violation of the commerce clause would not exist merely because some loss of time, expense, and inconvenience was caused the railroad company in making the necessary changes in its headlight equipment in order to meet the requirements of different States, nor because such changes involved some additional expense. Such expenses and loss of time would impose no substantial burden on interstate commerce. The act is in no sense a regulation of interstate commerce. If every law enacted in the exercise of the police power with a design to enhance the public safety be declared void because it to some extent affects interstate commerce, many of the most salutary police regulations of the States must fall. In C. & P. T. Co. v. Manning, 186 U. S. 238 (22 Sup. Ct. 881, 46 L. ed. 1144), it was declared: "Courts always presume that a legislature in enacting statutes acts advisedly and with full knowledge of the situation, and they must accept its action as that of a body having full power to act, and only acting when it has acquired sufficient information to justify its action." Every presumption is to be indulged in favor of the constitutionality of an act. There is no legislation by Congress making any requirement with respect to the kind of headlight to be used on engines engaged in interstate business. The act in question is not violative of the commerce clause of the Federal constitution; and our answer to the 6th and 8th questions is in the negative.          *All the Justices concur.*