FEBRUARY 22, 1915.

---

## SEABOARD AIR-LINE RAILWAY *v.* BLACKWELL.

The provision of the Civil Code (1910), § 2675, which requires .the engineer of a locomotive to check the speed thereof on approaching a public-road crossing, so as to stop in time should any person or thing be crossing the railroad track on said road, is not unconstitutional as applied to a railway train while engaged in interstate commerce, under the conditions set forth in paragraph 23 of the defendant's answer, on the ground that, as thus applied, the statute is a regulation of interstate commerce and repugnant to the provision of the constitution of the United States that "the Congress shall have power to regulate commerce with foreign nations and among the several States." The statute is an exercise of the police power of the State, though to some extent it may indirectly affect interstate transportation.

FEBRUARY 23, 1915.

Questions certified by Court of Appeals (Case No. 5631).

Elizabeth Blackwell brought suit against the Seaboard Air-Line Railway for an alleged homicide by the defendant of her minor son, who, while traveling along a public road, came to a crossing on its line, which was about two miles east of the city of Elberton, where defendant's track crossed such public road, and, while crossing over the track in a buggy, was struck and killed by the engine of the defendant. An act of negligence alleged in the petition was the failure on the part of the defendant to comply with the provisions of the statute of this State commonly known as the "blow-post law." The 23d paragraph of the defendant's plea was: "And for

further plea and answer in this behalf this defendant says that in paragraph twelve (12) of said petition it is alleged as an act of negligence that the engineer in charge of the engine which is alleged to have caused the injury complained of failed to blow the whistle of the engine at a blow-post 400 yards south of the crossing where the homicide is alleged to have occurred, and failed to keep blowing said whistle until the train arrived at the crossing; and in paragraph thirteen (13) of said petition it is alleged that the employees of the defendant in charge of the engine which is alleged to have brought about the injury complained of failed to check the speed of the train at the blow-post 400 yards south of the crossing, and failed to keep checking the same until it reached the crossing, so as to stop in time should any person or thing be crossing said track on said road; and such failure on the part of the employees on said train is alleged in said paragraph to be negligence. In other parts of said petition it is inferentially charged that a failure on the part of the employees in charge of the train to comply with what is known as the blow-post law in force in this State was negligence on the part of this defendant; and it is sought in said petition, and especially the paragraphs above referred to, to charge this defendant, as a matter of law, in failing to have its employees comply with the provisions of said blow-post law. This defendant denies that the failure to comply with said blow-post law was negligence on its part relatively to the transaction in question. This defendant alleges that the law above referred to as the blow-post law is that set forth in sections 2675, 2676, and 2677 of the Code of this State, adopted in 1910, and is in the following language:

'§ 2675. *A post to be erected.* There must be fixed on the line of said roads, and at the distance of four hundred yards from the center of each of such road crossings, and on each side thereof, a post, and the engineer shall be required, whenever he shall arrive at either of said posts, to blow the whistle of the locomotive until it arrives at the public road, and to simultaneously check and keep checking the speed thereof, so as to stop in time should any person or thing be crossing said track on said road.

'§ 2676. *Neglecting to erect such posts.* Should any company fail or neglect to put up said posts, the superintendent thereof shall be guilty of a misdemeanor.

'§ 2677. *Failing to blow whistle.* If any engineer neglects to

blow said whistle as required, and to check the speed as required, he is guilty of a misdemeanor: Provided, that within the corporate limits of the cities, towns, and villages of this State, the several railroad companies shall not be required to blow the whistle of their locomotives on approaching crossings or public roads in said corporate limits, but in lieu thereof the engineer of said locomotive shall be required to signal the approach of their trains to such crossings and public roads in said corporate limits, by tolling the bell of said locomotive; and on failure to do so, the penalties of this section shall apply to such offense.'

"This defendant avers that the train of defendant which is referred to in the petition, as appears from the allegations of said petition, was a train which ran from Atlanta in the State of Georgia to Abbeville in the State of South Carolina, and said train was used as an instrumentality of this defendant in carrying on its business as an interstate carrier of passengers and freights between the points named, and in said train were carried passengers from the State of Georgia to the State of South Carolina and other States, and baggage from points in the State of Georgia to points in the State of South Carolina and other States, and upon said train also the Southern Express Company, under a contract with this defendant, carried articles of freight between Atlanta and other points in the State of Georgia to Abbeville and other points in the State of South Carolina, and other points in other States, and upon said train were also carried the mails of the United States, and the train in question was actually engaged in commerce between the several States, and especially between the State of Georgia and the State of South Carolina. This defendant avers that the line of this defendant over which said train was operated ran from the City of Atlanta, in the State of Georgia, to and over the Savannah river, which is the boundary line between the State of Georgia and the State of South Carolina, and thence to the City of Abbeville, in the State of South Carolina, and thence to other points in the States of North Carolina and Virginia. This defendant alleges that between the City of Atlanta, in the State of Georgia, and the Savannah river, where the same is the boundary line of the State of Georgia, there are one hundred and twenty-four (124) points where the line of this defendant crosses public roads of the different counties of this State, established pursuant to law,

and all of such crossings are at grade. This defendant alleges that the distance from the City of Atlanta to the line of the State at the Savannah river, traversed by the line of railway of this defendant, is one hundred and twenty-three (123) miles. This defendant alleges that, according to the provisions of said blow-post law above set forth, it is required of the engineer in charge of railway trains to begin to check the train at a point 400 yards from each road crossing and to continue to check during the time that said 400 yards is being traversed, and have the engine under such control at the crossing that if any person or thing shall be upon the crossing it shall be in the power of the engineer to stop the train before it passes the crossing. This defendant avers, that in order to comply with said law it will be necessary for the engineer in charge of the train to so slacken the speed of the train that there would be practically a full stop of the train at each of the road crossings over which the line of railway was constructed. This defendant avers that the time that would be required to so check and slacken the speed of the train, and then, after the crossing was passed, to increase the speed to the rate at which the train was running, would depend upon various conditions that might or might not exist at the time and at the crossings, such as the weight of the train, the state of the weather as affecting the condition of the rail, and the per cent. of the grade. This defendant avers that to comply with said law relatively to a train composed of an engine and three cars, consisting of a mail-car and two coaches or similar cars, the time consumed in checking and slackening speed and increasing speed after the crossing was passed would not be less than three (3) minutes, and that if the train was composed of a larger number of cars the time consumed would be greater. This defendant avers that this allegation as to the time consumed in complying with such law at each crossing is based upon ordinary conditions; that is, where there is no grade, or the percentage of grade is low, where the conditions of the weather are such as not to affect the track, and all conditions are usual and ordinary. This defendant avers that where the grade is heavy or great and the track is affected by the weather, the time consumed would be greater. This defendant avers that, a train composed of an engine and freight-cars being ordinarily a longer train than a passenger-train, the time consumed in complying with said law at each crossing with

the average freight-train would be not less than five minutes. This defendant avers that the train referred to in the petition, which is alleged to have caused the injury complained of, was a train composed of an engine, a mail-car, and two coaches; that is to say, a train composed of an engine and three ordinary coaches; and this defendant avers that if the provisions of the blow-post law above set forth had been complied with on the day in question, from the time that said train left Atlanta in the State of Georgia until it reached the Savannah river, the boundary line of the State, that at least three minutes would have been consumed at each crossing in complying with said blow-post law, and that the time consumed in compliance with said law on the day in question between the City of Atlanta and the Savannah river would have been more than six hours. This defendant alleges that according to the adopted schedule of said train the time consumed in running from the City of Atlanta to the Savannah river was four hours and thirty minutes; and this schedule was operated by giving a signal from the whistle of the engine on the approach to each crossing, but not checking and slackening speed in approaching the crossing; and that if said law had been complied with, the time consumed in operating the train from the City of Atlanta to the Savannah river would have been more than ten hours and a half. This defendant further avers that the maximum rate of speed for freight-trains upon the line of this defendant is twenty miles an hour; and that if the law was complied with in the operation of freight-trains between the City of Atlanta and the Savannah river, the time consumed in complying with said law at the public-road crossings would be ten hours or more, and the time consumed in operating a freight-train between the City of Atlanta and the Savannah river would be more than sixteen hours. This defendant further alleges that the 124 public-road crossings above referred to are the usual and ordinary grade crossings, and there is nothing in the conditions surrounding which makes any one of them peculiarly dangerous, other than such danger as may result from the crossing of a public road by a railroad track at grade. This defendant further alleges that between the City of Atlanta and the Savannah river the line of railway of this defendant crosses the tracks of two other railroads, and that under the laws of this State, wherever one railroad track crosses another, the engineer in charge of the train is required to

16

bring his train to a full stop fifty feet from the crossing, and that the time consumed in such crossings would increase the time required to operate the trains between the points above referred to. This defendant alleges that the blow-post law above referred to, in so far as it requires the engineer in charge of trains to begin to check his train at a point 400 yards from the crossing and to keep checking until the crossing is reached, and have his train under such control that the same can be stopped if there should be any person or thing upon said track at said crossing, is, as applied to the train in question which is alleged to have brought about the injury complained of, a regulation of interstate commerce and an unreasonable regulation of such commerce, and is in violation of paragraph three, section eight, article one, of the constitution of the United States, which declares, 'The Congress shall have power to regulate commerce with foreign nations and among the several States and with the Indian tribes,' which confers upon Congress the exclusive power to regulate the commerce among the several States; and said blow-post law is, as applied to the train in question, null and void. Wherefore this defendant says that each and every allegation of said petition which charges this defendant with negligence in failing to comply with said law, and especially paragraphs twelve and thirteen of said petition, set forth no act which would in law amount to negligence; and this defendant alleges that it is not guilty of any negligence under the facts so alleged, and is not liable to plaintiff on account of its failure to comply with the provisions of said blow-post law; and all of this said defendant is ready to verify."

To this special plea the plaintiff filed a written demurrer, and a motion to strike the same, upon the ground that it set forth no legal defense against the cause of action set out in the plaintiff's petition. The trial court sustained the demurrer and struck the special plea above referred to, "except so much as reads as follows: 'This defendant denies that the failure to comply with said blow-post law was negligence on its part relatively to the transaction in question.'" The defendant excepted pendente lite, assigning error upon this ruling. The case proceeded to trial, and resulted in a verdict in favor of the plaintiff. The defendant's motion for a new trial having been overruled, it sued out a bill of exceptions to the Court of Appeals, assigning error upon the refusal to grant a new

trial, and upon the exceptions pendente lite. The Court of Appeals propounded the following question to this court: "Is the provision of the Civil Code, § 2675, which requires the engineer of a locomotive to check the speed thereof on approaching a public-road crossing, so as to stop in time should any person or thing be crossing the railroad track on said road, unconstitutional so far as applied to a railway train while engaged in interstate commerce, under the conditions set forth in paragraph 23 of the defendant's answer, for the reason that, as thus applied, the statute is a regulation of interstate commerce and repugnant to the provision of the constitution of the United States that 'the Congress shall have power to regulate commerce with foreign nations and among the several States'?" (In incorporated towns or cities the bell of the engine is required to be rung in approaching public crossings, in lieu of the blowing of the whistle.)

*Cobb & Erwin, Z. B. Rogers, H. J. Brewer,* and *F. C. Shackelford,* for plaintiff in error. *Pulliam Proffitt,* contra.

LUMPKIN, J. It is well established by decisions of the Supreme Court of the United States that the right to regulate interstate commerce is exclusively vested in Congress, and that the States can not pass any laws directly regulating such commerce; but that the States may, in the exercise of their police power, pass laws in the interest of public safety which do not interfere directly with the operation of interstate commerce; that the constitutionality of a State statute regulating the operation of railroad trains depends upon its effect on interstate commerce; and that, in the absence of congressional regulation on the subject, a State may make reasonable regulations as to the manner in which trains shall approach, and give notice of their approach to, dangerous crossings, so long as they are not a direct burden upon interstate commerce. *Southern Ry. Co. v. King,* 217 U. S. 524 (30 Sup. Ct. 594, 54 L. ed. 863). No exact rule can be formulated by which to determine in advance what enactments along this line by States are valid and what are invalid. In *Southern Ry. Co. v. Atlanta Sand Co.,* 135 *Ga.* 35 (68 S. E. 807), it was said (p. 46): "As the Supreme Court of the United States have mentioned reasonableness as a guide in determining the extent to which a State law may affect interstate shipments without being invalid, and as reasonableness or unreasonableness is a matter for which no absolute standard can be pre-

scribed, but a thing sometimes appears reasonable to one mind, yet unreasonable to another, and even the same person may change his view as to what is reasonable with age, experience, and reflection, the determination of questions like that now before us involves no small difficulty." We will cite only a few of the many cases in which State laws have been held valid though to some extent affecting interstate commerce. In Louisville & Nashville R. Co. *v.* Kentucky, 161 U. S. 677 (16 Sup. Ct. 714, 40 L. ed. 849), Mr. Justice Brown said (p. 702) : "It has never been supposed that the dominant power of Congress over interstate commerce took from the States the power of legislation with respect to the instruments of such commerce, so far as the legislation was within its ordinary police powers. Nearly all the railways in the country have been constructed under State authority, and it can not be supposed that they intended to abandon their power over them as soon as they were finished. The power to construct them involves necessarily the power to impose such regulations upon their operation as a sound regard for the interests of the public may seem to render desirable. In the division of authority with respect to interstate railways Congress reserves to itself the superior right to control their commerce and forbid interference therewith; while to the States remains the power to create and to regulate the instruments of such commerce, so far as necessary to the conservation of the public interests." In that case a State statute of Kentucky prohibiting a railroad or other common carrier from consolidating or pooling its earnings with a parallel or competing line, and prohibiting certain other leases and combinations, was held valid. In *Hennington* v. *State,* 90 *Ga.* 396 (17 S. E. 1009), a statute of this State which made it a misdemeanor to run a freight-train on Sunday was upheld; and this was affirmed in Hennington *v.* Georgia, 163 U. S. 299 (16 Sup. Ct. 1086, 41 L. ed. 166). *Seale* v. *State,* 126 *Ga.* 644 (55 S. E. 472). In *Atlantic Coast Line Railroad Co.* v. *State,* 135 *Ga.* 545 (69 S. E. 725, 32 L. R. A. (N. S.) 20), a law of this State which required railroads to use headlights of a certain character was upheld; and this was affirmed in 234 U. S. 280 (34 Sup. Ct. 829, 58 L. ed. 1312). In Lake Shore &c. Ry. Co. *v.* Ohio, 173 U. S. 285 (19 Sup. Ct. 465, 43 L. ed. 702), a State law requiring three regular passenger-trains to stop each way daily at every village containing over 3,000 inhabitants was upheld.

In Erb *v.* Morasch, 177 U. S. 584 (20 Sup. Ct. 819, 44 L. ed. 897), it was held that a regulation by the city of the speed at which railroad trains might run within its limits was valid, although applicable to interstate trains, at least until Congress had acted on the subject. We forbear undertaking to map out "the twilight zone" in which State authorities may act until Congress has acted on the subject. See also Crutcher *v.* Kentucky, 141 U. S. 47 (11 Sup. Ct. 851, 35 L. ed. 649) ; *Southern Railway* v. *Melton,* 133 *Ga.* 277, 298 (65 S. E. 665), and cit.; *Southern Railway Co.* v. *Atlanta Sand &c. Co.,* supra.

In *Southern Railway Co.* v. *Grizzle,* 131 *Ga.* 287 (62 S. E. 177), it was declared that the section of the State code now under consideration was not, with respect to a railroad company doing an interstate business, invalid as being a regulation of interstate commerce, but was a police regulation designed to secure public safety, and valid as such.

In *Central Railroad Co.* v. *Hall,* 109 *Ga.* 367 (34 S. E. 605), the actual ruling was that where the crossing was one half mile from the depot from which the train started, the law applied. In the opinion Mr. Chief Justice Simmons expressed some views as to the hardship or effect upon rapid transit which might arise from the law. What he said on this subject was an obiter dictum. He practically conceded the propriety of such a law before the days of rapid transit, as an exercise of the police power for the preservation of the public safety. It can hardly be claimed that rapid transit is more important than human life. It must also be borne in mind that while the commerce of the country calls for rapid transit, the local development and increase in population also create a greater necessity for public highways and for means for protecting the safety of those who use them.

In Southern Railway Co. *v.* King, supra, it was held that one who would strike down a statute as unconstitutional must show that it affects him injuriously and actually deprives him of a constitutional right. Mr. Justice Day said (pp. 536, 537), "They [referring to the averments of the plea] do not show the number or location of the crossings at which the railway company would be required to check the speed of its trains so as to interfere with their successful operation. For aught that appears as allegations of fact in this answer, the crossing at which this injury happened

may have been so located and of such dangerous character as to make the slackening of trains at that point necessary to the safety of those using the public highway, and a statute making such requirement only a reasonable police regulation, and not an unlawful attempt to regulate or hinder interstate commerce. In the absence of facts setting up a situation showing the unreasonable character of the statute as applied to the defendant under the circumstances, we think the amended answer set up no legal defense, and that the demurrer thereto was properly sustained."

If the State legislature may regulate the speed of trains in approaching dangerous crossings and the signals to be given in so doing, necessarily it must be allowed some judgment in determining when such regulations should be made. It requires no argument to prove that grade crossings are dangerous, especially in populous communities. In urging that, if the number of these crossings increase, the police power of the State terminates, there is danger of taking the anomalous position that as the danger to the public increases the State loses its authority to protect its citizens therefrom. Take, for instance, a populous city. The streets may cross the railroad at frequent intervals, and many people may pass over them. Surely this would rather furnish a reason for holding that the State has the power to protect the public in such places of danger than that its effort to do so would be invalid because it might require a railroad train coming from another State to slacken its speed at those places. In the present case the railroad company alleges that between Atlanta and the Savannah river (a distance of 123 miles) there are one hundred and twenty-four grade crossings. It is hardly within the range of possibility that they are distributed equally along the line. On the contrary it may fairly be assumed that many of these crossings are in populous sections,—at stations or in towns or cities along the route. It is not alleged how many of them are in the country or in sparsely settled districts. So that it may be that the very situation hypothetically stated above may actually exist in this case, and the railroad company may be complaining that at a place in a populous section there are frequent crossings, and that it ought not to be required by the State law to regard the safety of the public at such places, because of the very increase of danger at them. It does not appear that the operation or speed of trains in stretches of

country sparsely settled and with few crossings is seriously affected, or that the trains may not run for long distances without stoppage; or that slowing down from a high speed in populous places may not serve for several crossings, if such allegations would make a difference. Surely it could not be held that a railroad company has the right to run at an unrestricted speed, and without giving proper signals, through towns, villages, or densely populated communities because there may be frequent grade crossings at such places. Furthermore, crossings may be situated between two neighboring communities, or they may be at places of danger where to prohibit the State from restricting the speed and requiring the giving of signals would be to license rashness.

The public have a right to use the public highways. Railroads have no inherent right to pass over them, except by virtue of a franchise from the State. The State has the right, in the exercise of its police power, to pass laws to preserve the public safety. Laws must be general in their character, and can not well single out and specify one public crossing and omit another, if the condition is such as to make a police regulation for safety proper. The mere fact that on a particular day or series of days a great number of people may not pass over a particular crossing is not conclusive that it is not a place requiring protection to the public. On other days there may be reasons why a great number of people would pass over the same crossing. Who shall determine when the State shall exercise the unquestionable police power for the safety of the lives of its citizens? Shall it be the legislature who represents the sovereignty of the State in making laws, or shall every law thus enacted be subject to the opinion of a jury? How far shall the legislative discretion in determining whether a particular protective law should be enacted be nullified, where it undoubtedly has some basis, and the entire matter be relegated as a mere question of fact to a jury in each case, with the possibility of differences in their findings? Shall the law which requires the erection of blowposts, the giving of signals, and the regulation of speed, for the protection of the public at the crossing of public highways at grade over railroads, be entirely in the air, and applicable to one public crossing and not to another, or to the same crossing at some times and not at others, according as a jury may find in regard to it? Under our system issues of fact are for the jury; and if the validity

of this law in each case becomes a question of fact, then it will be impossible to tell in advance what is the law applicable to crossings of public highways and railroads. Or shall it be determined by the opinion of a court in each case, with a like resulting uncertainty?

In the present case it is alleged in general. terms that the 124 public-road crossings over the defendant's line of road in this State are the usual and ordinary grade crossings, and that there is nothing in the conditions surrounding them which makes any one of them peculiarly dangerous, other than such danger as is incident to the crossing of a public highway by the railroad track at grade. We do not think that this is sufficient to show that the law is invalid. Applying the well-recognized rule that allegations are to be construed most strongly against the pleader, this does not negative the fact that all of these crossings are dangerous. It in effect concedes that they are all dangerous as grade crossings, but merely alleges in general terms that there is nothing to make any one of them peculiarly dangerous other than this fact. Nothing more is stated as to the particular crossing where the injury occurred, except that it is within about two miles of a city.

In the Civil Code (1910), § 2585, par. 5, which forms a part of the general law on the subject of incorporation of railroad companies and their powers, it is declared that, "whenever the track of any such road shall touch, intersect, or cross any road, highway, or street, it may be carried over or under, or cross at grade level or otherwise, as may be found most expedient for the public good." This section was taken from the act of 1892, but a similar provision existed under the act of 1881. While the defendant company may be a foreign corporation, it must operate in Georgia by virtue of a Georgia franchise; and while the charter under which it, or some subordinate company under the franchise of which it may operate, may not have been granted under the general incorporation law, yet that law indicates a public policy by which railroad companies may avoid danger and delays at grade crossings by means of crossings above or below grade. The code section now under consideration does not apply where the crossing is not at grade. *Barton* v. *Southern Railway Co.,* 132 *Ga.* 841 (64 S. E. 1079, 22 L. R. A. (N. S.) 915, 16 Ann. Cas. 1232). It is quite probable that in many instances grade crossings could be obviated alto-

gether.  Has a railroad company the constitutional right to dis-
regard laws for obviating delays and dangers, and nevertheless to
declare that the legislature can not enact a law of the character
now under consideration for the protection of the public where
grade crossings exist, and when in the legislative opinion there is
reasonable ground for such an enactment?

If the rule is that one who seeks to overthrow a police regulation
enacted by a State for public safety must make out a clear case in
order to accomplish that purpose, it seems to us that the railroad
in this case has failed to do so.  Congress has not undertaken to
pass any law covering the subject involved in the code section now
being considered.  It is therefore not a case of a conflict of a State
law and an act of Congress within the power of the latter to pass;
but it is a question whether the legislative power of this State has
been so arbitrarily used that it shall be declared that the power con-
ferred by the constitution of the United States upon Congress to
regulate commerce among the several States shall ex proprio vigore
strike down the hands of the State when they stretch out to protect
the public from danger.

The police regulation of speed and signals at highway crossings
over a railroad in the State is not a matter which is inherently and
exclusively one for congressional control; otherwise, the decisions
upholding some of these State regulations could not have been
made.  Congress has not assumed control over the subject.  The
law under consideration does not undertake directly to deal with
interstate commerce.  Whatever effect such law may have on inter-
state commerce is only incidental and indirect.  It does not prohibit
interstate commerce or in terms refer to it.  It does not directly
impose any burden on it.  It merely provides for public safety at
railroad crossings where the legislature have determined that such
provision was necessary; and if it causes trains to move somewhat
more slowly at such places, as a means of safety to the public, how
can it be declared that such a law is invalid?

We recognize the ruling made in Southern Ry. Co. v. King, supra,
and by no means intend to disregard what was there decided.  But,
if what we have said above is well founded, the ruling here made
does not conflict with what is held in that case.  When a State
statute is on trial for its life, some presumption in its favor should
be indulged, and it should not be declared void except in a clear

case. We do not think that such a case has been made here as requires a declaration that the section of the State Code which is attacked is invalid relatively to the railroad company.

If we should declare this police law of the State unconstitutional or invalid, should it be held void in toto as to all railroads and all crossings within the State over which interstate trains or commerce may pass, without regard to the number of such crossings over the different railroads, and their situations, or dangerous character; or should the law be declared invalid only as to the Seaboard Air-Line Railway, leaving it to stand as to all other railroads, at least until further consideration; and if it should be declared invalid as to the Seaboard Air-Line Railway, should it be so declared as to all crossings of public highways over that road, whether in populous districts, or in towns or cities, or not, or only as to the particular crossing where the injury complained of in this case occurred? Moreover, the danger to the public is as great from an interstate train as from an intrastate train. If we should hold, relatively to interstate trains, that this law is invalid, or invalid as to certain railroads, or as to certain crossings, should we still hold that, relatively to intrastate trains and those carrying only intrastate commerce, the provision is legitimate and valid to safeguard the public? In other words, is it a good law for some railroads, some trains, and some crossings, and an invalid law as to other railroads and other trains and other crossings, though the purpose of the law in all cases is to provide for the safety of the public? It must be remembered that railroads are in the nature of public highways, and that other public roads are also public highways, and that the traveling public have the right to use these public highways which traverse the country, though they may cross the lines of railroads.

Of course, the facts well pleaded must be taken as true on demurrer, whether in fact they are correct or not. And we have so considered them in the preceding discussion. Mere conclusions are not admitted by a demurrer.

*All the Justices concur, except Fish, C. J., absent.*