# CASES

DECIDED IN THE]

# SUPREME COURT OF GEORGIA

AT THE

## OCTOBER TERM, 1911

### STRICKLAND *v.* THE STATE.

1. The act of the General Assembly, approved August 12, 1910 (Georgia Laws 1910, p. 134), entitled "An act to prohibit any person from having or carrying a revolver without first having obtained a license from the ordinary of the county of said State, in which the party resides, and to provide how said license may be obtained and a penalty prescribed for a violation of the same, and for other purposes," is not null and void because in violation of article 1, § 1, par. 22, of the constitution of the State, which provides: "The right of the people to keep and bear arms shall not be infringed, but the General Assembly shall have power to prescribe the manner in which arms shall be borne." (Atkinson, J., dissents.)

2. The act described in the preceding headnote is not violative of the right of the citizen, under article 8, § 2, of the constitution of the United States, which declares: "A well-regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be infringed."

OCTOBER 5, 1911.

The Court of Appeals certified to the Supreme Court the following questions: "Is the act of the General Assembly of the State of Georgia, approved August 12, 1910 (Georgia Laws 1910, p. 134), entitled 'An act to prohibit any person from having or carrying about his person, in any county in the State of Georgia, any pistol or revolver without first having obtained a license from the ordinary of the county of said State, in which the party resides, and to provide how said license may be obtained and a penalty prescribed for a violation of the same, and for other purposes,' null and void, because in violation of article 1, § 1, par. 22, of the constitu-

·tion of the State of Georgia, which provides: 'The right of the . people to keep and bear arms shall not be infringed, but the General Assembly shall have power to prescribe the manner in which arms may be borne'? Is this act in violation of the right of the citizen, under article 8, § 2, of the constitution of the United States (Civil Code (1910), § 6685), which provides: 'A well-regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be infringed'?"

*R. W. Adamson* and *Napier & Maynard,* for plaintiff in error.
*C. E. Roop, solicitor,* contra.

Briefs were filed, under the Code, § 6196, by *F. H. Harris, H. S. White, E. F. Brigham, I. S. Peebles Jr.,* and *R. N. Holtzclaw.*

LUMPKIN, J. The first question propounded by the Court of Appeals is whether the act of August 12, 1910 (Acts 1910, p. 134), entitled "An act to prohibit any person from having or carrying about his·person, in any county in the State of Georgia, any pistol or revolver without first having obtained a license from the ordinary of the county of said State, in which the party resides, and to provide how said license may be obtained and a penalty prescribed for a violation of the same, and for other purposes," is violative of article 1, § 1, par. 22, of the constitution of this State, which provides that "the right of the people to keep and bear arms shall not be infringed, but the General Assembly shall have power to prescribe the manner in which arms may be borne."

1. First let us glance hastily at some of the English laws which antedated the introduction into the Federal constitution, and into the constitutions of many of the States, of provisions in reference to bearing arms. As early as A. D. 1328, the statute of 2 Ed. III was passed, prohibiting persons "to go or ride armed by night or by day." And it has been declared that at common law riding or going about armed with dangerous or unusual weapons, to the terror of the people, was always indictable. Bish. Stat. Cr. (3d ed.) §§ 783, 784; 4 Bl. Com. 149. By the act·of 22 and 23 Car. II, c. 25, § 3, it was provided that no person who had not lands of the yearly value of £100, except certain specified persons, should be allowed to keep a gun, etc. James II arbitrarily disarmed the Protestant population, and quartered Catholic soldiers among the people. After the revolution which forced his abdication, in the first year of the reign of William and Mary ·an act of Parliament

was passed which recited certain abuses which had existed, and asserted certain rights and privileges. Among the grounds of complaint recited were the keeping of a standing army within the kingdom in time of peace, without the consent of Parliament, and quartering soldiers contrary to law, and "causing several good subjects, being Protestants, to be disarmed, at the same time when Papists were both armed and employed contrary to law" The bill of rights no doubt arose from the conduct of the Stuarts. It followed the declaration of rights, to which the Prince of Orange assented. Among other things, it declared that "the subjects which are Protestants may have arms for their defense, suitable to their condition and as allowed by law." This was not an unlimited conference of authority upon the Protestants, but only insured them rights under the law, which allowed persons of a certain rank and condition to have arms.

When the second amendment to the constitution of the United States was adopted, it declared: "A well-regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be infringed." The third amendment also declared that no soldier shall, in time of peace, be quartered in any house without the consent of the owner, nor in time of war, except in the manner to be prescribed by law. Some similar provision has been incorporated in most of the State constitutions. The language employed has not always been uniform. In some cases the preliminary reference to the importance of an efficient militia is made, and in some it is omitted, and there are other verbal differences. But the common element is the assurance of the right "to bear arms."

One of the first questions which was raised under the constitutional provisions on this subject was whether they were violated by laws which prohibited the carrying of concealed weapons. In the case of Bliss v. Commonwealth, 2 Litt. (Ky.) 90 (13 Am. D. 251), decided in 1822, the Supreme Court of Kentucky declared that an act to prevent the carrying of concealed weapons was unconstitutional and void as impairing the constitutional right to bear arms. This ruling has not been followed, but severely criticised. The decisions are practically unanimous to the contrary. Aymette v. State, 21 Tenn. (2 Humph.) 154; State v. Wilforth, 74 Mo. 528 (41 Am. R. 330); State v. Reid, 1 Ala. 612 (35 Am.

D. 44) ; State v. Spellet, 86 N. C. 697; State v. Mitchell, 3 Blackf. (Ind.) 229; Wright v. Commonwealth, 77 Pa. 470; State v. Jumel, 13 La. Ann. 399; State v. Buzzard, 4 Ark. 18; note to case of In re Brickey, 1 Am. & Eng. Ann. Cas. 55, 56; Ex parte Thomas, 21 Okl. 770 (97 Pac. 260, 20 L. R. A. (N. S.) 1007, 17 Am. & Eng. Ann. Cas. 566, and note).

In several States other statutes, regulatory in their nature, or prohibiting the carrying of certain kinds of weapons, or the carrying of weapons under certain circumstances and at certain places, have been upheld. In Andrews v. State, 3 Heisk. (Tenn.) 165 (8 Am. R. 8), the Supreme Court of Tennessee held that an act of the legislature providing that it should not be lawful for any person to publicly or privately carry a dirk, sword-cane, Spanish stilletto, belt or pocket pistol, or revolver, was constitutional, except as to a revolver; that the word "revolver" might include a pistol adapted to the equipment of a militiaman or soldier, or a weapon not so adapted; that if the weapon designated by the statute was of the former character, the absolute prohibition against it was too broad. In the opinion, in speaking of the arms in the use of which a soldier should be trained, at one place the word "repeater" was used. But it was evident that reference was made to army and navy repeaters of a character used in modern warfare, and not to every pistol which might repeat its fire. The pocket revolver was not meant; for in Page v. State, 3 Heisk. (Tenn.) 198, the court sustained a conviction for carrying such a pistol. In the opinion it was said that "the evidence fully establishes the fact that the pistol carried by Page was not an arm for war purposes, and therefore, under the ruling of this court in the case of Andrews v. State, decided at Jackson, it was a weapon, the carrying of which the legislature could constitutionally prohibit." In Fife v. State, 31 Ark. 455 (25 Am. R. 556), an act was under consideration which provided that "any person who shall bear or carry any pistol of any kind whatever, or any dirk, butcher or bowie knife, or sword or spear in a cane, brass or metal knucks, or razor, as a weapon, shall be adjudged guilty of a misdemeanor," etc. The court, in construing the act, said: "From the company in which the pistol is placed, and the known public mischief which the legislature intended by the act to prevent, it is manifest that the pistol intended to be proscribed is such as is usually carried in the pocket, or of a size to be

concealed about the person, and used in private quarrels and brawls, and not such as is in ordinary use, and effective as a weapon of war, and useful and necessary for 'the common defense.' "' It was held that the act did not infringe the constitutional privilege of the citizen to bear arms.

In State *v.* Wilburn, 7 Baxt. (Tenn.) 57 (32 Am. R. 551), it was held that a law prohibiting the carrying of an army pistol, except in the hand, was not violative of the constitutional provision of that State in regard to the right of citizens to bear arms for the common defense, which also stated that the legislature should have power, by law, to regulate the wearing of arms, with a view to prevent crime. In Haile *v.* State, 38 Ark. 564 (42 Am. R. 3), it was held that a statute prohibiting the carrying of army pistols by non-military persons, except uncovered and in the hand, was not unconstitutional.

In West Virginia an act was passed which made it a misdemeanor to carry about the person any revolver or other pistol, dirk, bowie-knife, razor, slungshot, billy, metallic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, or to sell or furnish any such weapon to one whom the furnisher knew, or had reason from his appearance or otherwise to believe, to be under the age of 21 years. Certain exceptions were made as to keeping or carrying a pistol about the dwelling of the owner, or from the place where it was purchased to his dwelling-house, etc. In State *v.* Workman, 35 W. Va. 367 (14 S. E. 9, 14 L. R. A. 600), it was held, that whenever an act of the legislature can be so construed as to avoid conflict with the constitution, such construction will be adopted by the courts, and that the act was not unconstitutional. In Ex parte Thomas, 21 Okl. 770 (97 Pac. 260, 20 L. R. A. (N. S.) 1007, 17 Am. & Eng. Ann. Cas. 566), it was held that the word "arms," as used in the Oklahoma constitution, providing that "the right of a citizen to keep and bear arms . . shall never be prohibited," has reference to such arms as are recognized in civilized warfare, and not to weapons mentioned in the statute of that State which forbade the carrying about the person of any pistol, revolver, bowie-knife, dirk, knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon, except as in the act provided.

In City of Salina *v.* Blaksley, 72 Kan. 230 (83 Pac. 619, 3 L. R.

A, (N. S.) 168, 115 Am. St. R. 196, 7 Am. & Eng. Ann. Cas. 925),
the Supreme Court of Kansas went further than any other case
which has come to the attention of the writer, and held that the pro-
vision of the constitution of that State that "the people shall have
the right to bear arms for their defense and security" was a limi-
tation upon the legislative power to enact laws prohibiting the bear-
·ing of arms in the militia, or any other military organization pro-
vided for by law, but was not a limitation on legislative power to
enact laws prohibiting and punishing the promiscuous carrying of
arms or other deadly weapons.

In Re Brickey, 8 Idaho, 597 (70 Pac. 609, 101 Am. St. R. 215),
the Supreme Court of Idaho held, that, while it is undoubtedly
within the police power of the legislature to prohibit the carrying
of concealed deadly weapons, the legislature has no power to pro-
hibit absolutely the carrying of deadly weapons in any manner
whatsoever, in cities, towns, and villages; such a regulation being
repugnant to those provisions of both the State and Federal con-
stitutions which guarantee to the citizens the right to bear arms.
In so far as reference was made to the Federal constitution, the de-
cision was the result of oversight, as will presently be seen.

An examination of the various decisions, whether dealing with
laws against carrying concealed weapons, or with regulations as to
the manner of carrying certain weapons, or the prohibition against
carrying weapons of a particular character, will show that two gen-
eral lines of reasoning have been employed in upholding such stat-
utes: first, that such provisions are to be construed in the light of
the origin of the constitutional declarations, of their connection
with words declaratory of the necessity for an efficient militia or
for the common defense, or the like, where they are used, and in
view of the general public purpose which such provisions were in-
tended to subserve; and second, that the right to bear arms, like
other rights of person and property, is to be construed in connec-
tion with the general police power of the State, and as subject to
legitimate regulation thereunder. Where a State constitution in
terms provides, in connection with the right to bear arms, that the
State may regulate this right, or may regulate the manner of bear-
ing arms, these words expressly recognize the police power in direct
connection with the constitutional declaration as to the right. But
even where such expressions do not occur, it has been held that

the different provisions of the constitution must be construed to-gether, and that the declaration or preservation of certain rights is not to be segregated and treated as arbitrary, but in connection with the general police power of the State, unless the language of the instrument itself should exclude such a construction. Thus, if the right to bear arms includes deadly weapons of every character, and is absolute and arbitrary in its nature, it might well be argued, as it was in earlier days, that the citizen was guaranteed the right to carry weapons or arms, in the broadest meaning of that term, whenever, wherever, and however he pleased, and that any regula-tion, unless expressly provided for in the constitution, was an in-fringement of that right. The ruling that the legislature may pro-hibit the carrying of concealed weapons essentially concedes the police power of regulation to some extent. If this be conceded, the question then becomes óne as to whether the particular regulation involved is legitimate and reasonably within the police power, or whether it is arbitrary, and, under the name of regulation, amounts in effect to a deprivation of the constitutional right.

Various other rights are guaranteed by the constitution, but they are construed in connection with the general police power of the State. The constitution prohibits the passage of any law curtailing or restraining the liberty of speech or of the press. But it has never been held that this gave the arbitrary right to a person to make public speeches or shout his sentiments, at all times and in all places, regardless of interference with public order; nor has it ever been held that such guaranties interfered with laws making libel and slander punishable. The right of contract has been held to be a part of the liberty of the citizen, and yet various contracts have been subjected to police regulation. The right to go from place to place is subject to police regulation for the public health and safety, as, for instance, in times of epidemics. Other illustrations might readily be given.

Let us now consider more especially the laws and decisions of this State on the subject. The provision in reference to bearing arms appeared in the constitution of 1861. It was again incorpo-rated in the constitution of 1865 and that of 1868. In the latter the same language was used as in the constitution of 1877, except that it contained the preamble: "A well-regulated militia being necessary to the security of a free people." In the constitution of

1877,.these words were not employed in that immediate connection, but were used in article 10, § 1, par. 1, treating of the militia; and it was doubtless deemed unnecessary to reiterate them in both connections. While proceedings of a constitutional convention may be looked to, they do not furnish a controlling construction of the meaning of words in the constitution. Such an instrument derives its vitality and force from its adoption by the people, rather than from the intentions or views of certain members of the convention, or expressions of individual opinions in speeches.

The first case which arose in this State on the subject under consideration was that of *Nunn* v. *State* (which was decided in 1846), 1 *Ga.* 243. At that time it was still a somewhat mooted question whether the second amendment to the constitution of the United States was a limitation on the power of Congress only, or also affected that of the State legislatures, although Barron *v.* Baltimore, 7 Pet. 243 (8 L. ed. 672), had been decided. An examination of the decisions of courts will show that some very reputable authorities had expressed the opinion that the amendment applied to State legislatures, as well as to Congress. As already noted, the Supreme Court of Idaho, as late as 1902, still treated it as a limitation upon the State governments, and as a guaranty to the individual citizen. In this condition of judicial consideration, the *Nunn* case was decided. It was said: "A law which merely inhibits the wearing of certain weapons in a concealed manner is valid. But so far as it cuts off the exercise of the right of the citizen altogether to bear arms, or, under the color of prescribing the mode, renders the right itself useless, it is in conflict with the constitution, and void." As at that time there was no provision on the subject in the State constitution, and the only constitutional declaration quoted was from the second amendment to the Federal constitution, it is clear that the court took the view that such amendment was a restriction upon the legislature of the State, as well as upon Congress, and what was said was in reference to the Federal constitution. The opinion contains some broad language used in discussion; but evidently it was never intended to hold that men, women, and children had some inherent right to keep and carry arms or weapons of every description, which could not be infringed by the legislature, unless as a result of the constitutional provision under consideration. Since that time the Supreme Court of the United States, whose

construction of the Federal constitution is conclusive, has held that the second amendment to that instrument was a restriction upon the power of Congress only. In United States v. Cruikshank, 92 U. S. 542 (23 L. ed. 588), it was said: "The second amendment means no more than that it [the right to bear arms] shall not be infringed by Congress, and has no other effect than to restrict the powers of the national government. Sovereignty, for the protection of the rights of life and personal liberty within the respective States, rests alone with the States." Presser v. Illinois, 116 U. S. 252 (6 Sup. Ct. 580, 29 L. ed. 615); Twining v. New Jersey, 211 U. S. 78 (29 Sup. Ct. 14, 53 L. ed. 97). In Stockdale v. State, 32 Ga. 225, the only point really decided was whether the court erred in refusing a request to give a charge as to what exposure of a weapon would satisfy the act prohibiting the carrying of concealed weapons, and in charging to the effect that, if any part of a pistol was concealed, it was a violation of the law. No constitutional question was involved; and, so far as the reference to the Nunn case mentioned such a question, it was obiter dictum.

In Hill v. State, 53 Ga. 472, an act which made it penal to carry about the person any dirk, bowie-knife, revolver, or any kind of deadly weapon to any court of justice or any election grounds or precinct, or any place of public worship, or any other public gathering in this State, except militia muster grounds, was attacked as violative of the provision of the constitution of 1868 in regard to the right of the people to keep and bear arms. Speaking of the meaning of this clause of the constitution, McCay, J., made use of the following vigorous utterance: "It is to secure the existence of a well-regulated militia; that, by the express words of the clause, was the object of it, and I have always been at a loss to follow the line of thought that extends the guaranty to the right to carry pistols, dirks, bowie-knives, and those other weapons of like character, which, as all admit, are the greatest nuisances of our day. It is, in my judgment, a perversion of the meaning of the word 'arms,' as used in the phrase 'the right to keep and bear arms,' to treat it as including weapons of this character. The preamble of the clause is the key to the meaning of it. The word 'arms' evidently means the arms of a militiaman, the weapons ordinarily used in battle, to wit, guns of every kind, swords, bayonets, horseman's pistols, etc. The very words 'bear arms' had then, and now

have, a technical meaning. The 'arms-bearing' part of a people were its men fit for service on the field of battle. That country was 'armed' that had an army ready for fight. The call 'to arms' was a call to put on the habiliments of battle, and I greatly doubt if in any good author of those days a use of the word 'arms,' when applied to a people, can be found, which includes pocket pistols, dirks, sword-canes, toothpicks, bowie-knives, and a host of other relics of past barbarism, or inventions of modern savagery of like character. In what manner the right to keep and bear these pests of society can encourage or secure the existence of a militia, and especially of a well-regulated militia, I am not able to divine." He said, that if it should be held (following the opinion in the *Nunn* case) that the guaranty of our State constitution was intended to include weapons of the character mentioned, the act was still not unconstitutional; that the power to "prescribe the manner in which arms may be borne" should be given a reasonable interpretation, and that it included the power to prescribe, not only the particular way in which such weapons might be carried, such as openly or secretly, on the shoulder or in the hand, loaded or unloaded, cocked or uncocked, capped or uncapped, but also the time when and the place where they might be borne. He said: "The constitution is to be construed as a whole. One part of it is not to be understood in such a sense as will militate against another. It is as well the duty of the General Assembly to pass laws for the protection of the person and property of the citizens, as it is to abstain from any infringement of the right to bear arms. The preservation of the public peace, and the protection of the people against violence, are constitutional duties of the legislature, and the guaranty of the right to keep and bear arms is to be understood and construed in connection and in harmony with these constitutional duties." Bish. St. Cr. (3d ed.) § 793. Surely no one will contend that children have a constitutional right to go to school with revolvers strapped around them, or that men and women have a right to go to church, or sit in the court-rooms, or crowd around election precincts, armed like desperadoes, and that this is beyond the power of the legislature to prevent.

It was argued that the requirement of a license to carry the weapons named in the act, and the fixing of a fee of 50 cents, were obnoxious to the constitutional provision. If this argument be

sound, then practically the whole licensing system would be destroyed on the ground that to require a license is not a regulation, but a prohibition. Many persons are required to obtain a license before engaging in certain businesses or performing certain acts; where a legitimate exercise of the police power of the State, it has never been thought that this was a violation of any constitutional right as to person or property. It was contended also that a requirement of a bond of $100, conditioned upon a proper and legitimate use of the weapon, rendered the act obnoxious to the constitution. It was said that this might deprive some persons who could not give a bond of the right to carry the weapon. There are many cases in which a person may exercise a certain right by giving a bond. Numerous public officers are required to furnish bond before taking charge of the office, but this has not been thought to be unconstitutional because some citizen might desire to hold the office who could not give the bond. The right to appeal to the courts is guaranteed by the constitution. In order to obtain a writ of attachment the plaintiff must give bond. It would hardly be said that, because he could not give the bond required by the statute, he was unconstitutionally excluded from appealing to the court in that manner. Illustrations might be multiplied. We think, upon careful consideration, that the regulatory provisions of the act of 1910 are not so arbitrary or unreasonable as to amount, in effect, to a prohibition of the right to bear arms, or an infringement of that right as protected by the constitution.

Acts of the legislature ought to be given a reasonable and sensible construction, and one which will not conflict with the constitution, where it is practicable to do so. *County of DeKalb* v. *City of Atlanta,* 132 *Ga.* 727 (2), (65 S. E. 72) ; *Southern Ry. Co.* v. *Atlanta Sand Co.,* 135 *Ga.* 36 (5), (68 S. E. 807) ; *Atlantic Coast Line R. Co.* v. *State,* 135 *Ga.* 545, 561 (69 S. E. 725, 32 L. R. A. (N. S.) 20). The illustrations given by Blackstone, in connection with his rules for construing statutes, are familiar. Among them is a law forbidding a layman to "lay hands" on a priest, which was construed to include hurting him with a weapon; a law forbidding all ecclesiastical persons to purchase "provisions" at Rome, which should be construed as not including "grain or other victuals," but nominations to benefices, which were known as ecclesiastical provisions; a law declaring that those who in a storm forsook a

ship should forfeit all property therein, and the ship and lading should belong to those who staid in it, which was construed not to apply in favor of a sick passenger, who, by reason of his disease, was unable to get out and escape; and a law which declared that "whoever draws blood in the streets" should be punished, which was held not to apply to a surgeon, who opened the vein of a person who fell down in the street in a fit. 1 Bl. Com. 60, 61. We are not called upon to determine whether the act of 1910 offends the rules of rhetoric or English grammar, but whether it violates the constitution. The act should receive a reasonable construction. Suppose that the owner of a pistol should accidentally drop it from the window of his dwelling to the street. A narrow and literal construction of the act might make it penal for him to pick it up and carry it into his house. It is lawful to sell pistols. But a similar construction might make it impossible for the carrier to deliver them to the dealer, or the dealer to deliver them to the customer. We will not anticipate that any such construction will be given, but one which will carry out the legislative purpose.

2. The second question propounded by the Court of Appeals is whether the act of 1910 is in violation of the right of a citizen, under article 8, § 2, of the constitution of the United States, which provides: "A well-regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be infringed." What has been said above answers this question in the negative. It is not contended that anything contained in this act affects, or was intended to affect, any Federal law passed in pursuance of the constitution of the United States in regard to the regulation of militia.

*All the Justices concur, except Beck, J., absent, and*

ATKINSON, J., dissenting. The first question propounded by the Court of Appeals should be answered in the affirmative. The correctness of the answer depends upon a proper construction of the statute in question, and of the constitution of this State. In construing the constitution on the subject, its history is such as to make manifest the intention of the people in adopting it, and the intent, as thus shown, should be given effect. Precedents of other States, consisting of rulings of courts, relative to constitutions, statutes, and questions which were not identical with those of our own, and which probably had different histories, can have but little, if any, weight

in showing the intention of the makers of our constitution and statutes. Resort to the history of the early English laws on the subject of the right to bear arms is not important, otherwise than as to be suggestive of reasons why it should have been expressly put in our fundamental law that the inherent right of the people to bear arms should never be infringed by the legislative power in the exercise of the right to enact laws.

Section 1 of the act, concerning the constitutionality of which the question is propounded, declares: "That from and after the passage of this act it shall be unlawful for any person to have or carry about his person, in any county in the State of Georgia, any pistol or revolver, without first taking out a license from the ordinary of the respective counties in which the party resides, before such person shall be at liberty to carry around with him on his person, or to have in his manual possession outside of his own home or place of business; provided, that nothing in this act shall be construed to alter, affect, or amend any laws now in force in this State, relative to the carrying of concealed weapons on or about one's person; and provided further, that this shall not apply to sheriffs, deputy sheriffs, marshals, or other arresting officers of this State or United States who are now allowed, by law, to carry revolvers; nor to any of the militia of said State while in service or upon duty; nor to any students of military colleges or schools when they are in the discharge of their duty at such colleges." Section 2 declares: "That the ordinary of the respective counties of this State, in which the applicant resides, may grant such license, either in term time or during vacation, upon the application of party or person desiring to apply for such license; provided, applicant shall be at least eighteen years old or over, and shall give a bond payable to the Governor of the State in the sum of one hundred dollars, conditioned upon the proper and legitimate use of said weapon, with a surety approved by the ordinary of said county, and the ordinary granting the license shall keep a record of the name of the person taking out such license, the name of the maker of the firearm to be carried, and the caliber and number of the same." Section 3 provides that "The person making such application, and to whom such license is granted, shall pay to the ordinary for granting said license the sum of fifty cents, which license shall cover a period of three years from date of granting same." Section 4 makes the violation of the act punishable as for a misdemeanor.

The majority refuse to "anticipate" that this act will be so construed as to render it unlawful for the owner of a pistol, who should accidentally drop it from his dwelling to the street, to afterwards pick it up and carry it into his house; or that if a pistol should be purchased, it would be unlawful for the dealer to deliver it or the purchaser to receive, it. When some such question arises, it can not be passed over lightly. An existing statute prohibits the carrying of a pistol concealed; and in a prosecution for the violation of this statute, it has been held that if a pistol be carried concealed but for a moment it is a violation of the law. *Brinson* v. *State*, 75 *Ga.* 882. But the provisions of the act above quoted extend further than to instances such as mentioned by the majority. Under them no person, male or female, under the age of 18 years, other than such as might come within certain classes specifically excepted, could lawfully carry around on his person, or have in his manual possession, any kind of pistol or revolver, for any purpose whatever, in any conceivable manner, elsewhere than in his own home or place of business. Nor could any person over the age of 18 years do so without first having obtained a license so to do from the ordinary of the county, and having given bond and paid the prescribed fee. Relatively to a person under the age of 18 years, it matters not what the conditions or causes might be that would render it necessary for him or her, as the case might be, to go to or from his home or place of business, or what dangers might be encountered on the way, or how great the necessity for a pistol or revolver for the protection of self or property, he would violate the statute if on the way he carried in his hand, or otherwise about his person, a pistol or revolver. The same would apply to all persons over the age of 18 years, not falling within any of the excepted classes, unless they had complied with the prescribed conditions relative to obtaining a license, giving bond, and paying the fee. A non-resident, without a place of business, could not obtain a license. If there were a vacancy in the office of the ordinary, no person could obtain a license. However distasteful or inconvenient it might be to a law-abiding citizen to take out a license and be recorded as the carrier of a pistol, or, in case of remote distance from the ordinary, or inaccessibility to his office, however great the necessity of carrying a pistol or revolver for self-protection, before a license could be obtained, it would be a violation of this statute

to carry any kind of pistol or revolver in any manner whatever, and punishable as for a misdemeanor.

Whatever else might be said of this statute, it ought not to be held that it does not infringe the right to carry a pistol or revolver. As the statute is to be construed as infringing the right to carry a pistol or revolver, it only remains to determine whether "pistols or revolvers," as contemplated by this act, are to be classed as "arms," within the meaning of the constitution of this State, which declares that "the right of the people to keep and bear arms shall not be infringed, but the General Assembly shall have the power to prescribe the manner in which arms may be borne." If they were so contemplated, then the act is obnoxious to this clause of the constitution. The act contemplates all pistols and revolvers, because it excepts none. If it had not contemplated specially pistols and revolvers, such as belong to the accoutrement of the militia, the militia would not have been included among the classes which were excepted from its operation. By such an exception, the act gave to the militia the right of carrying pistols and revolvers of the kind which it undertook to deny to other people. If it were a proper test and right to hold that the constitution, by the use of the word "arms," contemplated only such as were borne by the militia, this act, according to the manifest purpose and intent of the legislature, would antagonize the constitution; but this dissent is not rested on that proposition. Before our constitution contained any declaration against the infringement upon the right of the people to bear arms, it was thought by this court that the second amendment to the constitution of the United States, which is set forth in the second question propounded by the Court of Appeals, prohibited legislation by State legislatures which infringed the right to bear arms, and that the constitution last mentioned, which did not refer to "pistols or revolvers," otherwise than as might be comprehended by the word "arms," contemplated pistols. That such was the understanding of this court at that time is shown by the decision rendered in the case of *Nunn* v. *State,* 1 *Ga.* 243, which has been referred to by the majority. Nunn had been convicted under the act of 1837, which made it a misdemeanor "for any merchant or vendor of wares or merchandise in this State, or any person or persons whatever, to sell, or to offer to sell, or to keep or to have about their persons, or elsewhere, any of the here-

inafter described weapons, to wit: Bowie or any other kinds of knives, manufactured and sold for the purpose of wearing or carrying the same as arms of offense or defense; pistols, dirks, sword-canes, spears, etc., shall also be contemplated in this act, save such pistols as are known and used as horseman's pistols." Cobb's Dig. 848. This act was attacked as being unconstitutional, and it was so held by this court, and the judgment of the lower court refusing a new trial was reversed. The effect of the decision was to hold that a pistol was an "arm," in the meaning of the constitution. The court, expressing the opinion through Lumpkin, J., said: "We are of the opinion, then, that so far as the act of 1837 seeks to suppress the practice of carrying certain weapons secretly, that it is valid, inasmuch as it does not deprive the citizen of his natural right of self-defense, or of his constitutional right to keep and bear arms. But that so much of it as contains a prohibition against bearing arms openly is in conflict with the constitution, and void; and that as the defendant has been indicted and convicted for carrying a pistol, without charging that it was done in a concealed manner, under that portion of the statute which entirely forbids its use, the judgment of the court below must be reversed, and the proceeding quashed."

This decision was rendered in 1846, and was subsequently approved in the case of *Stockdale* v. *State,* 32 *Ga.* 225-227, which was decided at the January term, 1861. No constitutional question was raised in this latter case; but it is pertinent to the present discussion for the purpose of showing that this court construed the word "arms" to include "pistols." In the opinion, Lyon, J., after quoting so much of the opinion as is quoted above from the case of *Nunn* v. *State,* supra, said: "That decision has been constantly adhered to from that time to the present, and must continue to stand as the law of this court on that subject." It was further said: "To enforce the law, as the court construed it to the jury, would be to prohibit the bearing of those arms [pistols] altogether. . . What the legislature did intend was to compel persons who carried those weapons to so wear them about their persons that others, who might come in contact with them, might see that they were 'armed.'" Subsequently, in 1874, the decision of this court, in the case of *Hill* v. *State,* 53 *Ga.* 472, was rendered. Hill was indicted under a section of the code which prohibited the carrying

of a pistol, etc., to any court of justice, etc.   He was convicted, and this court affirmed the judgment of the lower court in refusing to grant a new trial, holding, among other things, that the statute under which he was indicted was not obnoxious to the constitution of this State, which declared: "A well-regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be infringed, but the General Assembly shall have the power to prescribe the manner in which arms may be borne."   McCay, J., speaking for himself, was of the opinion that if the question were entirely a new one, he should not hesitate to hold that the language of the constitution of this State, as well as that of the United States, guarantees only "the right to keep and bear the 'arms' necessary for a militiaman," and did not include pistols; and after criticising the reasoning in the case of *Nunn* v. *State,* supra, he said further:   "But, assuming that the guarantee of our State constitution was intended to include weapons of this character (which, considering that it was made a part of the constitution after the decision of *Nunn* v. *State,* 1 *Ga.* 243, is not improbable), we are still of the opinion that the act" under which the indictment was found was not unconstitutional.   The decision, however, was placed, not on a holding that pistols were not arms, as contemplated by the constitution, but upon a construction of that provision of the constitution which authorizes the legislature to regulate the manner in which arms might be borne, holding, in effect, that the right to regulate the manner of carrying arms authorized the legislation preventing them from being carried to courts of justice, etc.

The ruling so made was a concession that pistols were "arms," within the meaning of the constitution, but only saved the statute by construing the power to regulate the manner of carrying such arms into authority to provide that arms should not be carried to courts of justice.   There were no other decisions on this subject; but all of these, except the last, were rendered prior to the adoption of the constitution of 1861, which was the first time the makers of the constitution of this State saw fit to interpose.   When they spoke, they made an affirmative declaration which recognized the existence of the right of the people to bear arms, and placed a limitation on the power of the legislature with respect thereto, and declared that the right should not be infringed.   This was done

after "arms" had been construed by this court, in *Nunn* v. *State,* supra, to include pistols, and after this interpretation had been fol- lowed by the decision in *Stockdale* v. *State,* supra, in 1861, at which time the construction was reaffirmed. Subsequently the question was dealt with in other constitutions, as follows: The constitution of 1865, art. 1, § 1, par. 4 (Code 1868, § 4893), declared: "A well-regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be infringed." The constitution of 1868, art. 1, § 1, par. 14 (Code of 1873, § 5006), declared: "A well-regulated militia being necessary to the security of a free people, the right of the people to keep and bear arms shall not be infringed, but the General Assembly shall have the power to prescribe by law the manner in which arms may be borne." There was no other provision in the constitution on the subject until the adoption of the constitution of 1877, when the question was dealt with as set forth in the excerpt copied in the first question propounded by the Court of Appeals. Without going further, it is manifest that the framers of the constitution of 1877, by the use of the word "arms," as in that instrument employed, intended to include pistols. It would be strange to impute to them a different intention, when it is considered that the legislature had formerly so employed it, and the courts had so interpreted it from the time of the decision in *Nunn* v. *State,* 1 *Ga.* 243, up to the time of the decision in *Stockdale* v. *State,* 32 *Ga.* 225, in 1861, and still so recognized it in *Hill* v. *State,* 53 *Ga.* 472, in 1874, and especially when in the latter case the interpretation was specially mentioned and criticised by the judge rendering the opinion, before such interpretation was yielded to by the court. After such use and interpretation of the word, if it was intended by the constitution of 1877 to empower the legislature to deal with pistols on a different footing from other weapons of offense and defense, some change in expression on the subject would have been made.

But in looking to the real intent of the framers of the constitution, there is still more light on the subject, disclosed by Small's Report of the Constitutional Convention of 1877. "One of the aids in constitutional construction is an examination of the proceedings of the constitutional convention." *Butts County* v. *Jackson Banking Co.,* 129 *Ga.* 801, 805 (60 S. E: 149, 151, 15 L. R. A. (N. S.) 567, 121 Am. St. R. 244). See, also, *Wellborn* v. *Estes,* 70 *Ga.* 390,

401; *Blocker* v. *Boswell,* 109 *Ga.* 233 (34 S. E. 289) ; *State* v. *Central R. Co.,* 109 *Ga.* 728 (35 S. E. 37, 48 L. R. A. 351) ; *Epping* v. *Columbus,* 117 *Ga.* 264 (4), 271 (43 S. E. 803) ; *Park* v. *Candler,* 114 *Ga.* 466 (40 S. E. 523). By reference to Small's Report (page 56), it will be seen that section .19 of the bill of rights was: "A well-regulated militia being necessary for the security of a free people, the right of the people to keep and bear arms shall not be infringed, but the General Assembly shall have the power to prescribe the manner in which arms may be borne." When this section was under consideration, as appears on page 91, it was referred to as section 23, and a motion was made which in effect struck "A well-regulated militia being necessary for the security of a free people," for the reason that such a declaration had already been made in the section of the bill of rights on militia. After that amendment was carried, Mr. Toombs moved "to strike ,out all after the word 'infringed' and strike out 'but the General Assembly shall have the power to prescribe the manner in which arms may be borne,' insisting that 'the legislature has no power to prescribe how the people shall bear arms; that they shall not carry them in their boots, or anywhere else that they want to. I think the people have the right to keep and bear arms as they choose for their protection.'" On the other hand, Mr. Warren urged: "I hope the gentleman's motion will not prevail. The experience of all of us is that the General Assembly should have the right to regulate the manner of keeping and bearing arms. There is nothing which provokes bloodshed so much as the indiscriminate bearing of concealed weapons." The motion to amend was lost. Other amendments which were offered, but not adopted, were: (*a*) By inserting the word "place" after the word "manner," so as to give the .legislature the power to prescribe where a man shall carry arms and where not; (*b*) "when off their freeholds or away from their homes." Thus it appears from the debates that the members of the convention who framed the provision as it appears in the constitution of 1877 had in mind that "arms," as referred to in the clause as adopted, contemplated, not merely such arms of warfare as might be used by the militia, but especially small weapons which might be concealed about the person, which was in keeping with the interpretation theretofore placed on the word by the court.

Resort to the general law, relative to the police power of the

State, in this discussion, does not aid those who take a contrary view from that above expressed. It is the constitution which we are construing, being itself the fundamental law; and it regulates and may limit the police power. By the provision of the constitution in question, it was intended to limit the police power, when it was declared that "the right of the people to bear arms shall not be infringed." This declaration was modified all that it was intended that it should be modified by the other express declaration, "the General Assembly shall have the power to prescribe the manner in which arms may be borne." This was affirmative action upon the part of the people in adopting the constitution, and shows that the matter of restricting the legislature in the exercise of the police power of the State, relative to the right of the people to bear arms, received special consideration, and that there was no intent to further qualify the broad declaration which favored the right to bear arms. It was intended to guarantee to the people the right to bear arms, so that the legislature could do no more than to regulate the manner in which they should be borne. This guaranty was to all the "people," and was never intended to be restricted merely to those of the militia, or those intending to become such.

The majority answer the second question propounded by the Court of Appeals in the negative, on account of the reasoning placed in their discussion relative to the first question. I do not concur in the reasons which they urge; but, in view of the ruling in *Hill* v. *State,* 53 *Ga.* 472, U. S. *v.* Cruikshank, 92 U. S. 542 (23 L. ed. 588), Presser *v.* Illinois, 116 U. S. 252 (6 Sup. Ct. 580, 29 L. ed. 615), Spies *v.* Illinois, 123 U. S. 131 (8 Sup. Ct. 22, 31 L. ed. 80), Fife *v.* State, 31 Ark. 455 (25 Am. Rep. 556), and Eilenbecker *v.* Plymouth County, 134 U. S. 31 (10 Sup. Ct. 424, 33 L. ed. 801), I concede that the second amendment to the constitution of the United States relates only to limitations upon the power of Congress, and has no reference to State legislation, and accordingly concur in the judgment that the question should be answered in the negative.