NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: May 28, 2025

S25A0334. STEPHENS v. STATE OF GEORGIA.

PINSON, Justice.

Under Georgia law, a person between the ages of 18 and 21 may possess long guns and carry them in public. See OCGA §§ 16-11-126 (b), 16-11-132. He may also possess handguns and carry them on his own property, in his home, in his car and in his place of business, and he may use both long guns and handguns for hunting, fishing, or sport shooting with the associated license. Id. § 16-11-126 (a), (e). That said, unless he has received weapons training as part of his military service, a person may not carry a handgun in public as a general matter until he is 21. Id. § 16-11-129 (b) (2). But even then, if a person uses a handgun for self-defense or to defend others, it is an absolute defense under Georgia law for any alleged violation of state firearm regulations. Id. § 16-11-138.

The plaintiff here, Thomas Stephens, is 20 years old and wants to carry a handgun in public beyond the limited ways he can under current Georgia law. So he sued. Along with Georgia Second Amendment, Inc., which has since voluntarily dismissed its appeal, Stephens filed an action to challenge the state statute that allows public carry of handguns as a general matter only for people over the age of 21. See OCGA § 16-11-126 (g).[1] His challenge, however, is quite narrow. He does not allege that this statute violates the Second Amendment to the United States Constitution, but only that it violates Article I, Section I, Paragraph VIII of the Georgia Constitution of 1983. And he does not argue that the statute violates Paragraph VIII as it has been construed and applied under precedent of this Court that spans well over a century, but instead asks that we reconsider and overrule all of that precedent and replace it with legal

---

[1] The complaint and initial appeal were jointly filed by Stephens and Georgia Second Amendment, Inc. On February 26, 2025, after we asked the parties to address their standing in light of *Wasserman v. Franklin County*, 320 Ga. 624 (911 SE2d 583) (2025), Georgia Second Amendment moved to withdraw its appeal and we granted the motion, leaving Stephens as the only appellant. So we refer only to Stephens in this opinion, even though the filings below and the briefing in this Court were filed jointly by Stephens and Georgia Second Amendment.

tests developed in the federal courts for assessing federal constitutional rights.

We decline the invitation. State statutes are presumed constitutional, and the challenger faces a heavy burden to prove otherwise: he must establish that the conflict between the challenged law and our Constitution is "clear and palpable," and we must be "clearly satisfied of its unconstitutionality" to declare it so. *Ammons v. State*, 315 Ga. 149, 163 (3) (880 SE2d 544) (2022). Stephens has not met that burden. Demonstrating the original public meaning of constitutional text that first appeared in one of our constitutions in the 1860s (and has since been readopted into each new one) is a difficult task that requires careful attention to not only the language of the clause in question, but also its broader legal and historical context and applicable rules of constitutional construction. But Stephens largely fails to engage with that work, or with our longstanding precedent that sets out a consistent construction of Paragraph VIII. See *Hill v. State*, 53 Ga. 472, 480-483 (2) (1874); *Strickland v. State*, 137 Ga. 1, 7, 11 (1) (72 SE 260) (1911); *Carson v. State*, 241 Ga. 622, 628

(5) (a) (247 SE2d 68) (1978); *Landers v. State*, 250 Ga. 501, 503 (3) (299 SE2d 707) (1983); *Hertz v. Bennett*, 294 Ga. 62, 69 (3) (751 SE2d 90) (2013). Most problematic, Stephens does not even say how or why that construction is not consistent with the provision's original public meaning — at least not with any detail or real authority in support — and he offers no serious alternative construction that would establish what, in his view, the correct understanding of that original public meaning is. Instead, he asks us to uncritically import federal standards to guide the application of a provision unique to Georgia's Constitution — a practice we have regularly criticized and disapproved. Because Stephens has not offered a compelling argument to reconsider our consistent construction of Paragraph VIII, which he made a necessary part of his constitutional claim here, his claim fails.

1. *Background*

(a) *Statutory Framework*

Georgia law allows law-abiding citizens to carry firearms with few restrictions. Georgians over the age of 21 may carry handguns

or long guns in most places, openly or concealed, and with or without a license. See OCGA § 16-11-125.1 (2.1) (any person who is licensed or eligible to get a weapons carry license is a "lawful weapons carrier"); id. §§ 16-11-126, 16-11-127 (c) (authorizing lawful weapons carriers to carry handguns in most public and private places). The only exceptions to this permissive scheme are people who have been convicted of certain crimes, those adjudicated mentally incompetent or insane, and people under 21 years old, all of whom are generally not eligible for a weapons-carry license. See id. § 16-11-129 (b) (2).

Among Georgians younger than 21 years old, those under the age of 18 cannot "possess" a handgun or have it under their "control." OCGA § 16-11-132. But people from 18 to 20 years old retain substantial ability to carry firearms. They are eligible for a Georgia weapons carry license if they have completed basic training in the armed forces of the United States and are actively serving in or have been honorably discharged from the armed forces of the United States. See id. § 16-11-129 (b) (2) (A). And even without a license, young adults ages 18 to 20 may possess long guns and carry them in

public because, unlike minors, they are "not prohibited by law from possessing a handgun or long gun," see id. § 16-11-126, so they "may have or carry on [their] person a long gun," see id. § 16-11-132. For the same reason, see id. § 16-11-132, adults in this age bracket may possess and carry handguns on their own property and in their home, keep them in their car and place of business, see id. § 16-11-126 (a), and they may use handguns and long guns for hunting, fishing, or sport shooting with the appropriate hunting or fishing license (or when a hunting or fishing license is not required to engage in those activities), see id. § 16-11-126 (e). Finally, the necessary use of a long gun or handgun in any circumstances for defense of self or others will be an absolute defense to violating any provisions that restrict their ability to carry. Id. § 16-11-138. See also id. §§ 16-3-20, 16-3-21.

(b) *Proceedings Below*

Stephens applied for a weapons carry license when he was 18, and his application was denied because he was not 21. Stephens

then sued the State, contending that OCGA § 16-11-126 (g) (1) violates Paragraph VIII to the extent it prohibits Stephens and other 18- to 20-year-olds from obtaining Georgia weapons licenses and carrying handguns in public. As relief, Stephens sought a permanent injunction prohibiting the State from enforcing OCGA § 16-11-126 (g) (1).

As relevant here, the State moved to dismiss Stephens's complaint, contending that the statutory scheme prohibiting 18- to 20-year-olds from carrying handguns in public was a reasonable safety measure, that the age cut-off was not arbitrary, and that the regulation was not a complete prohibition on the right to keep and bear arms given the numerous statutory exceptions that allow these young adults to carry handguns in some places. The State also noted that someone in this age group is generally not prohibited from carrying a long gun in public, see OCGA § 16-11-126 (b), and self-defense and the defense of others is an absolute defense to a violation of OCGA § 16-11-126 (g) (1). So, the State contended, the statute was a permissible exercise of the police power authorized by the last

clause in Paragraph VIII of the Georgia Constitution, which author-
izes the General Assembly "to prescribe the manner in which arms
may be borne." Ga. Const. of 1983, Art. I, Sec. I, Par. VIII.

The trial court granted the State's motion to dismiss, agreeing
with the State's arguments and citing this Court's opinion in *Strick-
land v. State*, 137 Ga. 1 (72 SE 260) (1911), and decisions that fol-
lowed it.

Stephens appealed.

2. *Analysis*

(a) We interpret and apply language of the Georgia Constitu-
tion according to the meaning it had to members of the public at the
time it was ratified — that is, its original public meaning. *Elliott v.
State*, 305 Ga. 179, 181 (II) (824 SE2d 265) (2019). But when it comes
to Georgia's constitutional right to bear arms, found at Article I, Sec-
tion I, Paragraph VIII of the current Georgia Constitution, we do not
start the search for its meaning from scratch. Paragraph VIII of our
current Constitution says that "[t]he right of the people to keep and
bear arms shall not be infringed, but the General Assembly shall

have power to prescribe the manner in which arms may be borne."

Ga. Const. of 1983, Art. I, Sec. I, Par. VIII. This language first entered a Georgia Constitution in the 1860s,[2] and since then, our Court has interpreted and applied the provision a number of times, starting in 1874 and continuing up through 2013.

We interpreted our state constitutional right to bear arms in two early decisions, *Hill v. State*, 53 Ga. 472 (1874), and *Strickland v. State*, 137 Ga. 1 (72 SE 260) (1911).[3] In both decisions, we focused

---

[2] The first part of the provision, the guarantee of the right to keep and bear arms, was added to the Constitution of 1861. See Ga. Const. of 1861, Art. I, Sec. 6. ("The right of the people to keep and bear arms shall not be infringed."). In 1865, a "militia clause" was added to the Constitution of 1865, making Georgia's constitutional right to bear arms identical to the Second Amendment of the United States Constitution. See Ga. Const. of 1865, Art. I, Sec. 4 ("A well-regulated militia, being necessary to the security of a free State, the right of the people to keep and bear arms shall not be infringed."). In 1868, the clause we interpret today was added to the new Constitution of 1868. Ga. Const. of 1868, Art. I, Sec. XIV ("A well regulated Militia being necessary to the security of a free *people*, the right of the people to keep and bear arms shall not be infringed; *but the General Assembly shall have power to prescribe by law the manner in which arms may be borne.*" (change emphasized)). And in the Georgia Constitution of 1877, the militia clause was removed, leaving the language as it stands today. See Georgia Constitution of 1877, Art. I, Sec. I, Para. XXII.

[3] *Hill* addressed that right as it appeared in our 1868 Constitution, which included the same language that appears in our current Constitution along with the prefatory "militia clause" that mirrors that of the Second Amendment

9

on the last clause of what is now Paragraph VIII, which grants the General Assembly "power to prescribe the manner in which arms may be borne." After thorough and deliberate analysis of the text, relevant context, and precedent, we recognized in these decisions that this clause — call it the "manner clause" — operates as an express "qualification to the very guarantee itself" that was "intended to limit the broad words of the previous guarantee." *Hill*, 53 Ga. at 479-480 (2). See also *Strickland*, 137 Ga. at 6 (1) ("Where a State constitution in terms provides, in connection with the right to bear arms, that the State may regulate this right, or may regulate the manner of bearing arms, these words expressly recognize the police power in direct connection with the constitutional declaration as to the right."). Applying the "ordinary signification" of the phrase "manner in which arms may be borne," we held that this clause grants the General Assembly "the power to regulate the whole subject of using arms": not only whether they may be borne "openly or

---

to the United States Constitution. *Strickland* addressed our 1877 Constitution's version of the right, the language of which is identical to the right as it exists in our 1983 Constitution.

secretly, on the shoulder or in the hand, loaded or unloaded, cocked or uncocked, capped or uncapped," but also the "times and places" and "circumstances" of bearing arms. *Hill*, 53 Ga. at 480-483 (2). And we reasoned that such regulations would not violate the constitutional right to bear arms as long as they were not "unreasonable" or "arbitrary" and did not "amount[ ] in effect, to a deprivation of the constitutional right," *Strickland*, 137 Ga. at 7, 11 (1). See also *Hill*, 53 Ga. at 481 (2) (purported regulations of the "manner" of bearing arms that "would, in effect, be a denial of the right to bear arms altogether" would violate the right). Applying these standards, we upheld a law that banned the carrying of firearms in certain places, like churches and courts, see *Hill*, 53 Ga. at 474, 480, 482-483 (2), and a law requiring Georgians to get a license to carry a pistol or revolver on their persons, see *Strickland*, 137 Ga. at 11 (1).

The interpretation and legal standards set out in these prece-

11

dents have been the consistent construction of our state constitutional right to bear arms for well over a century,[4] and we have applied that standard in each case since that time asking whether a

---

[4] This understanding of our state constitutional right to bear arms has even deeper roots. Both *Hill* and *Strickland* cite one of the earliest opinions of this Court, *Nunn v. State*, 1 Ga. 243 (1846), which pre-dated the addition of an explicit right to bear arms to the Georgia Constitution. That decision, which interpreted the Second Amendment of the United States Constitution, explained that the Second Amendment protected the pre-existing "natural right of self-defence." Id. at 251 (emphasis omitted). In addressing the scope of this right, we explained that the right to bear arms did not take from the legislature the power to "enact laws in regard to *the manner* in which arms shall be borne." Id. at 249. That said, we reasoned that "[a] statute which, under the pretence of *regulating*, amounts to a *destruction* of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional." Id. at 249. The language that *Nunn* uses to describe the power reserved to the legislature to regulate the manner of bearing arms was included almost verbatim when Georgia added the language protecting the right to bear arms to our Constitution in the 1860s, and it remains in our Constitution today. And *Nunn*'s reasoning that such regulations could not "amount[ ] to a destruction of the right" is the basis for the legal standard our precedent has now consistently applied. Compare id. ("We do not desire to be understood as maintaining, that in regulating the manner of bearing arms, the authority of the Legislature has no other limit than its own discretion. A statute which, under the pretence of *regulating*, amounts to a *destruction* of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defense, would be clearly unconstitutional. But a law which is merely intended to promote personal security, and to put down lawless aggression and violence, and to this end prohibits the wearing of certain weapons in such a manner as is calculated to exert an unhappy influence upon the moral feelings of the wearer, by making him less regardful of the personal security of others, does not come in collision with the Constitution.") with *Hill*, 53 Ga. at 482-483 (2) (the legislature may limit the right to bear arms to "such times and places, and under such circumstances, as is necessary for the preservation of the peace, the protection of the person and property of the citizens, and the

regulation violates that right. See *Carson*, 241 Ga. at 628 (5) (a) (upholding ban on possessing sawed-off shotguns); *Landers*, 250 Ga. at 503 (3) (upholding law prohibiting convicted felons from possessing firearms); *Hertz*, 294 Ga. at 69 (3)  (upholding denial of firearms license application by person who had pleaded nolo contendere to five felony charges in Florida).

(b) In his principal brief before this Court, Stephens makes no argument that his constitutional challenge can succeed under this

---

fulfillment of the other constitutional duties of the legislature, provided the restriction does not interfere with the ordinary bearing and using arms, so that the 'people' shall become familiar with the use of them."); *Strickland*, 137 Ga. at 11 ("We think, upon careful consideration, that the [challenged] regulatory provisions of the act of 1910 are not so arbitrary or unreasonable as to amount, in effect, to a prohibition of the right to bear arms, or an infringement of that right as protected by the [C]onstitution."); *Carson*, 241 Ga. at 628 (5) (a) ("It was not arbitrary or unreasonable to prohibit the keeping and carrying of sawed-off shotguns . . . [and t]he Act does not prohibit the bearing of *all* arms."); *Landers*, 250 Ga. at 503 (3)  (applying *Strickland*, "[w]e find the statute [prohibiting possession of a firearm by a convicted felon] is a reasonable regulation authorized by the police power and thus not violative of our Constitution"); and *Hertz*, 294 Ga. at 69 (3) ("Since our decision in *Strickland*, we have rejected similar state constitutional challenges to laws regulating the possession of firearms" and, given appellant's nolo contendere plea to a felony offense, holding that "denying him a license to carry a weapon outside of his home, car, and place of business does not violate" Paragraph VIII).

consistent construction of Paragraph VIII.[5] In other words, as Stephens has argued that claim before us, it can succeed only if he can establish that this consistent construction of Paragraph VIII's language is wrong, that the entire line of longstanding precedent that arrived at and applied this construction must be reconsidered and overruled, and that his claim would succeed if that language were construed differently. And as a constitutional challenge to a statute, this claim is even harder than usual to win. It is well established that state statutes are presumed constitutional, and the burden is on the challenger to prove otherwise. *Ammons v. State*, 315 Ga. 149, 163 (3) (880 SE2d 544) (2022). That burden is a heavy one: to prove that a law is unconstitutional, the challenger must establish that the conflict between the challenged law and our Constitution is "clear and palpable," and we must be "clearly satisfied of its unconstitutionality" to declare it so. Id.

Stephens fails to meet that heavy burden here.

---

[5] To the extent that Stephens makes any such argument in his reply brief, we generally do not consider arguments raised for the first time in a reply brief. See *City of Atlanta v. Mays*, 301 Ga. 367, 372 (3) (801 SE2d 1) (2017).

For starters, even if this Court got the original public meaning of the relevant language wrong when it first construed that language in *Hill* (1874) and *Strickland* (1911), there is a good argument that the construction is now a settled part of the meaning of that language as it exists in our current Constitution of 1983. When we ask what that language meant at the time it was ratified in 1983, we have to consider two important pieces of legal context. First, if that language appeared in an earlier Georgia Constitution and was readopted without material change, it is "generally presume[d]" that the language "has retained the original public meaning that provision had at the time it first entered a Georgia Constitution, absent some indication to the contrary." *Elliott*, 305 Ga. at 183 (II) (A) (explaining this "presumption of constitutional continuity"). Second, if that readopted language was construed by our Court before it was readopted, it is presumed that the prior construction of that language is adopted along with the readopted language if that prior construction is considered "consistent and definitive." Id. at 184 (II)

15

(B) (explaining this presumption). The first presumption of constitutional continuity no doubt applies here, because Paragraph VIII consists of language that has been readopted from the 1877 Constitution (and the 1868 Constitution included that language as well). And the second presumption likely applies, too: *Hill* definitively construed the manner clause of what is now Paragraph VIII, which first appeared in the 1868 Constitution and has been readopted in five more Georgia Constitutions since then, including the current one, 53 Ga. at 479-483 (2); *Strickland* applied *Hill* and definitively construed the same language that was readopted into the next four constitutions including the current one, 137 Ga. at 11-12 (1); and *Carson* confirmed and applied that construction to the same language in 1978, just five years before our current constitution readopted that language, 241 Ga. at 627-628 (5) (a). If that set of precedents amounts to a "consistent and definitive" construction of our state constitutional right to bear arms, that construction is effectively baked into the meaning of the language as readopted into our current constitution.

16

But we need not decide here whether this construction is now definitive as to the meaning of Paragraph VIII because Stephens has not made "even the prima facie showing" to meet his heavy burden here. *Ammons*, 315 Ga. at 163 (3). As we have explained here and elsewhere, "[c]onstruing a constitutional provision, especially as an original matter, requires careful attention to not only the language of the clause in question, but also its broader legal and historical context, which are the primary determinants of a text's meaning." Id. Here, that would mean, at the least, addressing how best to understand the particular language of Paragraph VIII as an original matter given its broader legal and historical context and in light of our various canons and presumptions of constitutional construction. Stephens simply has not done that. Other than a conclusory argument that the manner clause "codifies the common understanding of the limit of the right," he does not say how exactly this Court's consistent construction of Paragraph VIII is not also consistent with its original public meaning. And even more problematic, he offers no serious alternative construction that would establish what, in his

17

view, the correct understanding of that original public meaning is. Instead, he merely asks us to import a choice of two legal standards from federal law: either "strict scrutiny," or the United States Supreme Court's recently minted "history and tradition" test for assessing Second Amendment challenges, see *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 24-25 (II) (C) (142 SCt 2111, 213 LE2d 387) (2022). These are not viable substitutes for a serious and considered attempt at determining the original public meaning of Georgia's constitutional text — particularly text that is notably different from the Second Amendment, which has no similar clause that expressly grants to the legislature the power to regulate the manner of bearing firearms. See *Wasserman v. Franklin County*, 320 Ga. 624, 626 (II) (911 SE2d 583) (2025) (explaining that "[t]ime and again we have criticized our own past practice of 'uncritically importing' holdings of federal courts to resolve questions about the meaning of Georgia law").[6]

---

[6] The invitation to adopt strict scrutiny is subject to special doubt. Federal courts first came up with and applied strict scrutiny almost a century after

In sum, Stephens has not offered a compelling argument that the original public meaning of Paragraph VIII is meaningfully different from the construction developed through our Court's consistent precedent addressing the language of that provision over more than a century. Because he has not established that our precedent construing this language is clearly wrong, we decline his invitation to reconsider it. And because his only argument that the statute he has challenged violates Paragraph VIII requires that we reconsider that precedent, his constitutional challenge to the statute fails.

*Judgment affirmed. Peterson, CJ, Warren, PJ, and Bethel, Ellington, McMillian, LaGrua, and Colvin, JJ, concur.*

---

Georgians ratified the constitutional language at issue here, see Richard H. Fallon, Jr., *Strict Judicial Scrutiny*, 54 UCLA L. Rev. 1267, 1275 (2007) (tracing the history of strict scrutiny to the 1960s), so any argument that the strict scrutiny standard is somehow the best construction of the original public meaning of the language now found in Paragraph VIII of our Constitution has an awful lot of work to do. See *Elliott*, 305 Ga. at 188 (II) (C). (For what it is worth, neither the United States Supreme Court nor this Court have applied strict scrutiny to laws that implicate the right to bear arms. See *Bruen*, 597 U.S. at 17-31 (II) (declining to apply strict scrutiny to a challenge brought under the Second Amendment to the United States Constitution); *Elliott*, 305 Ga. at 222 (IV) (E) (discussing strict scrutiny in the context of Georgia constitutional law at large).